**Affirmed and Memorandum Opinion filed February 26, 2015.**



**In The**

# Fourteenth Court of Appeals

---

### NO. 14-13-00724-CR

---

### MARCIA JACQUELINE DINANNO, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

### On Appeal from the 351st District Court
### Harris County, Texas
### Trial Court Cause No. 1299607

---

## M E M O R A N D U M   O P I N I O N

Appellant Marcia Jacqueline Dinanno was convicted of murder and sentenced to imprisonment for fifty years. Appellant now appeals her conviction, contending in two issues that the evidence is legally insufficient to support her conviction, and the trial court erred in admitting certain evidence. We disagree and affirm the trial court's judgment.

### BACKGROUND

On March 20, 2011, at 3:24 p.m., Deputy David Bair of the Harris County

Sheriff's Office was dispatched to an address at which it was reported an intruder had entered the residence. When Bair arrived at the address, dispatch updated the notice to inform him that the suspect had left the house. Bair and his partner, Deputy Clint Myers, checked the perimeter of the house. The gate to the backyard was secured, and there was no evidence of forced entry on the side of the house or at the front door. The deputies approached the front door with their guns drawn.

When the deputies knocked, appellant answered the door "soaking wet" and wearing underwear and a towel. Appellant told the deputies that her husband had been shot and was dead in the back room. The deputies discovered the husband lying on the floor of the master bathroom with a pistol at his feet and a black revolver nearby. The door leading from the master bedroom to the backyard was ajar with a dog crate positioned in front of it so that the door would not open fully. When a paramedic stepped outside to use his mobile phone he had to move the dog crate out of the way to exit the house. The only other way to exit the house from the master bedroom was to climb over the crate. Indentations in the carpet under the dog crate led responding officers to believe that the crate had been in front of the door for a long time.

Appellant reported that a Hispanic male wearing a black mask, black shirt with a white stripe, and black shorts entered the master bedroom through the back patio door. Appellant reported that the suspect fled through the back door of the master bedroom. Appellant alleged that prior to fleeing, the unknown male placed a knife into her vagina. Appellant's hands were bagged to test for gunshot residue.

A sexual assault nurse examiner was directed to perform an exam on appellant. Appellant initially declined physical and genital exams. According to the nurse's records, appellant reported the events as follows:

> I heard bang, bang, bang, bang. I said "Joe"—my husband—and walked down the hallway. I went into his bedroom and then looked in his bathroom and he was laying on the floor and he was bleeding. And then a man

grabbed me and threw me on the carpet. He started taking my clothes off and I told him: I can't have sex. And he said: Shut up, [expletive]. You can have sex with my knife. And I looked over and I could see my husband's face. He picked up the gun and told me to get in the bath and threw the clothes in with me and he started pouring the soap everywhere. And he said: Put your head under the water. I put my head under the water and he put shampoo on my head and I had to step out over my husband without a towel. He made me get on the bed. He made me walk to the bed naked and lay down. My dogs were barking, going crazy. He then ran out the back door.

Appellant returned to the exam room approximately five or ten minutes later and permitted a "brief visualization" of her genital area. The nurse observed a half-centimeter abrasion on the labia minor and multiple linear acute red abrasions (scratches) of three to six centimeters on her inner thighs.

Sergeant Mark Reynolds, a Harris County investigator, recorded an interview with appellant while she was at the hospital. Appellant explained in the interview that she had been cooking Shrimp Étoufée for dinner and her husband was getting dressed to go to the store to get a can of tomato paste. Appellant walked into the bedroom and heard, "bang, bang, bang." She went into the bathroom to find her husband, and saw an intruder who grabbed her, took her to the bedroom, and began to remove her pants. Appellant told the intruder, "I can't have sex. I'm too small." The intruder then said, "You can have sex with my knife."

Appellant indicated several places where the intruder had cut her. She stated that she could see her husband on the floor during the encounter with the intruder. Appellant then explained that the intruder took her into the bathroom, stepped over her husband, wiped the gun off on her shirt, placed her in the bath tub, poured soap on her, and made her place her head under the running water. When appellant got out of the bath tub, the intruder forced her to lie down on the bed in the master bedroom. Appellant's dogs were barking, which caused the intruder to leave through the door to the backyard.

After the intruder left, appellant went into the bathroom, asked whether her husband was "okay," and called 911. She complained to the investigator that no one would tell her whether her husband was okay. Appellant said the intruder was wearing a black mask and was dressed in black, but was not wearing shoes. She noticed he had a brown mustache, and recognized a Hispanic accent. Several times during the interview, appellant asked whether her husband was okay.

Deputy Mario Quintanilla was dispatched to the scene to investigate the report of an intruder. Quintanilla saw no signs of forced entry. He noted that there was debris on either side of the back gate, and a back door was ajar, but it was blocked by a dog crate. There were no signs of a struggle or theft from the home. When Quintanilla entered the dining room and kitchen he noticed that a dinner appeared to have been staged. Quintanilla believed the cooking items and dining table had been deliberately set up for investigators. A small handgun was in the night stand dresser in the bedroom. As Quintanilla was observing the scene, Reynolds, who was simultaneously interviewing appellant, relayed information from appellant. Quintanilla observed that the bath tub was dry, but the shower was wet. Next to the body in the bathroom were a pair of small slippers, which appeared to belong to either a small man or a woman. The slippers had drops of blood on them. A large kitchen knife was found on top of the bed, but the bed was dry. The dry bed and bath tub contradicted appellant's statement that the intruder left her on the bed immediately after pulling her out of the bath tub.

Appellant was arrested and subsequently gave a videotaped statement at the police station. In the video statement, appellant told much the same story as the statement from the hospital, adding the detail that the intruder threw her clothes in the bath tub with her. When the intruder left, she said she tried to use her wet blouse to wipe her husband's head.

Appellant's neighbor testified that he had been working in the yard on March 20, 2011, and heard a faint "pop," which sounded as if it were in the distance. He saw

4

police cars arriving in the neighborhood two-and-a-half to three hours after hearing the sound.

William Davis, a gunshot residue expert, testified that five particles of gunshot residue had been recovered from appellant's left hand. Davis explained that gunshot residue is a chemical residue, which is left when a gun is fired, and that the number of particles found when items are tested is related to whether the residue resulted from "a primary association with a shooting event," or from "secondary transfer." Davis described five particles as a positive result, which most likely resulted "from either firing a weapon, being in close proximity to a fired weapon, or handling a weapon that was recently fired." The slippers that appellant had been wearing contained 20 particles of gunshot residue. In contrast, the blouse and socks appellant had been wearing only contained two particles of gunshot residue. Davis further explained that if the items or appellant's hands had been placed in water prior to testing, that would possibly reduce the number of particles found.

Gary Clayton, a blood spatter expert, testified that he discovered traces of blood on the base of the outside of the bath tub in the master bathroom, but not inside the bath tub. Using a chemical that caused blood to fluoresce when it was not visible to the naked eye, Clayton observed blood on the floor and the walls in the master bath shower. He tested the bath tub and shower in the second bathroom, and discovered blood in those areas as well. Clayton testified that the small amount of blood found in the second bathroom could be consistent with someone standing in that room and scratching her arms and the inside of her thighs.

A DNA expert testified that several items in the home were tested, including the gun, appellant's clothes, and both bathrooms in the house. The analysis did not discover any DNA profiles that were not accounted for by either appellant, the deceased complainant, or one of the investigating officers.

The complainant's sister testified that she paid the complainant's bills after his death. She described the complainant as frugal and one who would not incur large credit card bills or take cash advances on credit cards. Following his death, she found several payments for large credit card bills, which she found uncharacteristic.

The jury found appellant guilty of murder and the trial court sentenced her to 50 years imprisonment.

## ANALYSIS

## I.      Sufficient evidence supports appellant's conviction.

In her first issue, appellant contends the evidence is insufficient to support her murder conviction. A person commits murder if she intentionally or knowingly causes the death of an individual. Tex. Penal Code Ann. § 19.02(b).

### A.      Standard of review

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether a rational jury could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)). In conducting this review, an appellate court considers all evidence in the record, whether it was admissible or inadmissible. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013) (citing *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999)).

We may not substitute our judgment for that of the jury by reevaluating the weight and credibility of the evidence. *Brooks v. State*, 323 S.W.3d 893, 900 (Tex. Crim. App. 2010). We defer to the jury's responsibility to resolve any conflicts in the evidence fairly, weigh the evidence, and draw reasonable inferences. *Id*. The jury alone decides whether to believe eyewitness testimony, and it resolves any conflicts in the evidence. *Id*.

6

In addition, because it is the sole judge of the weight and credibility of the evidence, the jury may find guilt without physical evidence linking the accused to the crime. *Johnson v. State*, 421 S.W.3d 893, 896–97 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Intent "may also be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant." *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). "[I]mplausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt." *Id.* In conducting a sufficiency review, we do not engage in a second evaluation of the weight and credibility of the evidence, but only ensure the jury reached a rational decision. *Young v. State*, 358 S.W.3d 790, 801 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd).

**B.     The evidence is sufficient to support the jury's implicit rejection of appellant's exculpatory explanation.**

The jury was presented with two conflicting theories: the State's theory that appellant killed her husband, and appellant's theory that an intruder killed him. The jury was able to assess the credibility and demeanor of the witnesses who testified at trial. The guilty verdict shows that the jury rejected appellant's exculpatory explanation. We review the evidence in the light most favorable to the verdict to determine whether it supports the jury's finding.

The record reflects that appellant reported the death of her husband at the hands of an intruder. Appellant reported that the intruder used a small knife to attack her, but used a gun he found in the house to kill her husband. A larger kitchen knife, which matched a set stored in a kitchen cabinet, was found on the bed in the master bedroom. Appellant was unable to explain the inconsistency between the physical evidence—the knife from the kitchen found in the bedroom—and her version of events in which the intruder brought his own knife to the scene. She further reported that the intruder placed her in the bath tub and cleaned her before fleeing out of the back door of the house.

When officers responded to appellant's 911 call, they found no signs of forced

entry. There was debris on both sides of the gate to the backyard, which reflected that no one had entered or exited from that gate. The back door of the master bedroom, the only open door to the outside, was blocked by a large dog crate, which had been blocking the door for so long as to leave an indentation in the carpet.

When appellant answered the officers' knock on the door, she was wet from recently bathing. The bath tub in which she claimed the intruder bathed her was dry. The shower was wet, and later forensics revealed blood in the shower. Appellant's clothes and slippers also contained blood spatter. Finally, despite having bathed, appellant had gunshot residue on her hands consistent with firing a gun or being close to a gun when it was fired. In appellant's version of events, she was not near the gun when it was fired.

In summary, appellant was found alone in her home with the complainant's body and gunshot residue on her hands. There was no physical evidence that anyone else had been on the property, and several pieces of evidence contradicted appellant's version of events. Considering the evidence in the light most favorable to the verdict, we conclude that it was sufficient for a rational jury to conclude beyond a reasonable doubt that appellant intentionally or knowingly caused the death of her husband. We therefore overrule appellant's first issue.

## II. The trial court did not err in admitting evidence of appellant's handwritten notes and financial statements found in her house pursuant to a valid search warrant.

In her second issue, appellant contends the trial court abused its discretion in admitting State's Exhibits 133 and 135 over her authenticity, relevance, and Rule 403 objections. During Deputy Quintanilla's testimony, the State offered exhibits 130 (husband's will), 131 (appellant's will), 133 (appellant's bank statement and credit card statement), and 135 (Alderman notes). Appellant objected that the documents had not been properly authenticated, were not relevant, and the probative value of the

documents was outweighed by their prejudicial effect. *See* Tex. R. Evid. 402, 403, 901. The trial court held a hearing outside the presence of the jury and overruled appellant's objections. We begin our analysis of appellant's issue challenging the admission of exhibits 133 and 135 by discussing the exhibits themselves.

### A.     Handwritten Alderman Notes—State's Exhibit 135

The "Alderman Notes" are handwritten notes concerning advice from Richard Alderman, a lawyer who gives generic legal advice on television and radio programs. With regard to the Alderman Notes, appellant objected to their admission as follows: "My objection, first of all, is authenticity. And then it's going to be relevancy and prejudice." In overruling appellant's objections, the trial court stated there was no requirement to authenticate items seized from the defendant's house.

On appeal, appellant contends the relevance of the Alderman notes "depends on 1) whether it was written by Ms. Dinanno, 2) whether the words 'financial oppression' referred to her state of mind at the time it was written, and 3) whether it described her state of mind on March 20, 2011"—the date of the complainant's death.

Quintanilla described the notes as a letter written to Richard Alderman, a legal advisor on television. The notes are dated July 1, 2010, and appear to be addressed to "Channel 13 Richard Alderman—People's Lawyer." The reference line contains appellant's and her husband's names. The notes, or letter, then list six items of apparent concern:

1.     Personal Concern/will keep info for future ref.

2.     Financial Consultation—to increase rate for both.

3.     Sell or buy of home in both names. Selling—amoration [sic] payments into shared bank account. Example—in case of emergency either person can make necessary monthly payment.

4.     Need shared bank account—safe deposit—savings account

5.     Whatever money being put into IRA—separate savings—to be

9

shared for future in both names

6.      If money is being moved don't let it be in amount that will keep you financially broke (sounds like it's past that stage—concern for wife already being indigent). Strongly recommends consultating [sic]—1 hour free.

The notes, or letter, continue:

Legally married by statue [sic] of Texas

Allowed credit card—200.00 month limit.

A few dollars left on counter sometimes.

Obviously financially oppressed—

> "For what purpose"??

The document then lists two addresses with financial amounts. The notes end with the words "Financially Oppressed. Concern."

## B.      Financial Records and "Sticky Note"—State's Exhibit 133

Exhibit 133 contained two Prosperity Bank statements in appellant's name, one dated December 9, 2007, and the other dated July 8, 2008; five statements for appellant's Capital One Mastercard, the first of which is dated March 23, 2009, and bears a "sticky note" stating: "No more using my credit card! I'm scared now. I think I should cancel [sic] it!!" The statement also contains handwritten notations about certain charges indicating that the complainant approved them. The other statements are dated May, June, July, and August 2010.

At trial, appellant objected to the bank and credit card records with the attached sticky note on grounds of authenticity, relevance, and Rule 403. Specifically, appellant objected: "Again, first of all, we're objecting to the authenticity of the sticky note. . . . We don't know who wrote it any more than we know who wrote that handwritten letter that was 135." Appellant further objected "to the records as a whole, as well as the sticky note for relevancy grounds under 401 and 402, prejudice under Rule 403." The trial court overruled appellant's objections. On appeal, appellant concedes that "there is

no reason to doubt that the notes were written by [appellant]," and argues only that the financial records and note did not reflect appellant's motive for murder.

## C.       The applicable law and standard of review

We review a trial court's ruling admitting evidence for an abuse of discretion. *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008). The trial court's ruling will be upheld as long as it falls within the zone of reasonable disagreement and is correct under any theory of law applicable to the case. *Id*.; *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). An appellate court must review the trial court's ruling in light of what was before the trial court at the time the ruling was made. *Dragoo v. State*, 96 S.W.3d 308, 313 (Tex. Crim. App. 2003).

A bedrock condition of admissibility of evidence is its relevance to an issue in the case—that is, its tendency to make a fact of consequence to determination of the action more or less probable. Tex. R. Evid. 401, 402. Except as otherwise provided by statute or rule, a jury is entitled to have before it all possible relevant information about the individual defendant whose fate it must determine. *Sells v. State*, 121 S.W.3d 748, 766 (Tex. Crim. App. 2003).

Evidence has no relevance if it is not authentically what its proponent claims it to be. *Tienda v. State*, 358 S.W.3d 633, 639 (Tex. Crim. App. 2012). Rule 901(a) defines authentication as a "condition precedent" to admissibility of evidence that requires the proponent to make a threshold showing that would be "sufficient to support a finding that the matter in question is what its proponent claims." Tex. R. Evid. 901(a). The issue of authentication—that the proffered evidence is what the proponent claims it to be— arises when "the relevancy of any evidence depends upon its identity, source, or connection with a particular person, place, thing, or event." *Campbell v. State*, 382 S.W.3d 545, 548–49 (Tex. App.—Austin 2012, no pet.) (quoting *Shea v. State*, 167 S.W.3d 98, 104 (Tex. App.—Waco 2005, pet. ref'd)). The trial court should admit

proffered evidence "upon, or subject to, the introduction of evidence sufficient to support a finding of" authenticity. Tex. R. Evid. 104(b). The ultimate question whether an item of evidence is what its proponent claims then becomes a question for the fact-finder. *Druery v. State*, 225 S.W.3d 491, 502 (Tex. Crim. App. 2007).

**D.     The trial court did not abuse its discretion in overruling appellant's authenticity and relevance objections.**

On appeal, appellant argues that finding the documents in appellant's home is not sufficient to show they are authentic or relevant. With regard to the Alderman notes, appellant argues there is no evidence that appellant wrote the notes, or that the references to "financial oppression" reflected her state of mind either at the time they were written in July 2010 or at the time of the murder in March 2011. With regard to the financial statements and note, appellant no longer disputes their authenticity and concedes she wrote the note, but argues the documents are not relevant to a motive for murder in 2011.

The State contends the documents are relevant because they tend to show appellant's motive for killing her husband. With regard to authenticity, the State argues, the documents only purported to be "documents found in appellant's home," and there is no dispute that they were found in appellant's home.

We begin our analysis with the authenticity of the Alderman notes. Appellant's authenticity challenge is based on the assumption that the State had to prove she wrote the notes. As explained above, however, the proponent of the evidence must only make a threshold showing "that the matter in question is what its proponent claims." Tex. R. Evid. 901(a). Here, the State claimed only that the notes were recovered from appellant's home. Quintanilla provided evidence to support that claim by testifying that the Alderman Notes and the bank and credit card statements were recovered from appellant's home pursuant to a valid search warrant. After the trial court overruled appellant's authenticity objection, Quintanilla testified that these documents were found

12

located among appellant's "personal papers." In an abuse-of-discretion review, the appellate court evaluates the ruling of the trial court in light of the evidence before the court at the time of the ruling. *Weatherred*, 15 S.W.3d at 542. The jury, however, could consider Quintanilla's additional testimony in determining the authenticity of the documents. *See Druery*, 225 S.W.3d at 502.

The State was not required to "rule out all possibilities inconsistent with authenticity or prove beyond any doubt that the evidence is what it purports to be." *Campbell*, 382 S.W.3d at 552. So long as the authenticity of the proffered evidence was at least "within the zone of reasonable disagreement," the jury was entitled to weigh the credibility of the documents and decide whether they showed proof of motive. *See id.*; *Tienda*, 358 S.W.3d at 638, 645–46. Based on Quintanilla's testimony, we hold the trial court was "within the zone of reasonable disagreement" in finding that the documents were what the State represented them to be, i.e., documents found in appellant's home. *See Tienda*, 358 S.W.3d at 638, 645–46 (explaining that conceivably someone could have concocted appellant's MySpace page, "[b]ut that is an alternate scenario whose likelihood and weight the jury was entitled to assess once the State had produced a prima facie showing that it was appellant, and not some unidentified conspirators or fraud artists, who created and maintained these MySpace pages").

We next address the relevance of the Alderman notes and the financial records and note. As noted above, relevant evidence is any evidence having any tendency to make the existence of any fact of consequence more or less probable than it would be without the evidence. Tex. R. Evid. 401. Thus, to be relevant, an item of evidence need not establish a fact by itself. *Johnson v. State*, 433 S.W.3d 546, 552 & n.24 (Tex. Crim. App. 2014). Evidence showing a motive to commit murder is a significant circumstance indicating guilt, and it is therefore relevant and admissible. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *Lopez v. State*, 200 S.W.3d 246, 251 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd).

Appellant argues the documents are not relevant to motive because there is no evidence she wrote the Alderman notes, and neither the notes nor the financial records from 2007 through 2010 establish her state of mind in March 2011. We disagree. It is undisputed that the Alderman notes were found in appellant's home and that they contained both appellant's and her husband's names, which suggests they were written by either appellant or her husband. While it is conceivable that someone else could have written the Alderman notes, that is an alternate scenario whose likelihood the jury was entitled to assess once the State produced prima facie evidence that the documents were found in appellant's home. *See Tienda*, 358 S.W.3d at 638, 645–46. In making that assessment, the jury could also consider Quintanilla's testimony that the documents were found in appellant's personal papers, as well as the similarities in handwriting between the Alderman note and appellant's note attached to her credit card statement. *See Druery*, 225 S.W.3d at 502.

In any event, regardless of whether the Alderman notes were written by appellant or her husband, they tend to show that there was financial discord in the marriage. The financial records and note, which appellant concedes she wrote, tend to support that fact. The trial court could reasonably conclude that this evidence is relevant because it tends to make a fact of consequence—appellant's possible motive—more likely. *See De La Paz v. State*, 279 S.W.3d 336, 349 (Tex. Crim. App. 2009). Moreover, as just explained, these documents do not have to establish appellant's motive by themselves to be relevant. Rather, the jury could consider them together with the testimony of the husband's sister that she found uncharacteristic payments of large credit card bills when paying the husband's bills after his death in March 2011, which tends to show the progression of the parties' financial issues. Accordingly, we conclude the trial court did not abuse its discretion in overruling appellant's relevance objections.

14

**E.  The trial court did not abuse its discretion in overruling appellant's Rule 403 objection.**

Relevant evidence may be excluded by the trial court under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice from its admission. Tex. R. Evid. 403. There is a presumption that relevant evidence is more probative than prejudicial. *Andrade v. State*, 246 S.W.3d 217, 227 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd). The opponent of the evidence has the burden to demonstrate that its prejudicial effect substantially outweighs its probative value. *Montgomery v. State*, 810 S.W.2d 372, 377 (Tex. Crim. App. 1990). If the opponent of the evidence lodges an objection based on Rule 403, the trial court must weigh the probative value of the evidence against the potential for unfair prejudice. *Andrade*, 246 S.W.3d at 227. The criteria for making that determination include: (1) the probative value of the evidence; (2) the potential the evidence has to impress the jury in an irrational but nevertheless indelible way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence to prove a fact of consequence. *Id*. at 228. A trial court's ruling on a Rule 403 objection also will not be overturned absent an abuse of discretion. *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005).

At trial, appellant objected "that the prejudice just outweighs any probative value [the documents] might have." On appeal, appellant does not address the factors used in weighing the probative value of the evidence against the danger of unfair prejudice. Instead, appellant claims the documents "were highly prejudicial because each would tend to 'suggest decision on an improper basis' and 'to confuse or distract the jury from the main issues[.]'"

In addressing the factors used in balancing the probative value of the evidence against the potential for unfair prejudice, we re-iterate that the evidence was relevant to show motive. The documents at issue, when considered along with evidence of appellant's more recent cash withdrawals from credit cards, tend to show the

progression of appellant's and her husband's financial issues. Thus, the probative value of the evidence was high. The State's need for the evidence was not necessarily high because motive is not an element of the offense. On the other hand, the State's other evidence of guilt was circumstantial, and any proof of motive tended to weigh in favor of appellant's guilt.

Next, we examine whether the evidence had a strong potential to impress the jury in an irrational and indelible way such that it would find guilt on grounds different from proof of the charged offense. The documentary evidence was not directly related to the murder. The evidence tended to aid the jury in attempting to understand a potential motive for murder, but the admission of the documents did not have a strong potential to impress the jury in such a way that it would irrationally find guilt on an improper basis. Finally, the time used to introduce the documents was not so great that it distracted the jury from considering the charged offense.

Having evaluated the Rule 403 factors, we hold the trial court did not abuse its discretion when it admitted the evidence over a Rule 403 objection. We overrule appellant's second issue.

The trial court's judgment is affirmed.


/s/     J. Brett Busby
Justice


Panel consists of Justices Christopher and Busby and Judge Dorfman.[1]
Do Not Publish — Tex. R. App. P. 47.2(b).

---

[1] The Honorable Grant Dorfman, Judge of the 334th District Court, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(h) (West 2013).