**Opinion issued October 27, 2022**



In The

# Court of Appeals

For The

# First District of Texas

———————————————

## NO. 01-21-00275-CR

———————————————

## XAVIER ALEJANDRO MARTINEZ, Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

**On Appeal from the 184th Criminal District Court**
**Harris County, Texas**
**Trial Court Case No. 1592017**

---

## MEMORANDUM OPINION

In a single issue, Xavier Alejandro Martinez appeals his murder conviction. He claims the trial court improperly admitted social-media messages without authentication under the rules of evidence. We conclude that one conversation was properly authenticated by the surrounding circumstances, but the rest of the

messages were not authenticated and erroneously admitted. However, this error did not affect Xavier's substantial rights because there was additional evidence supporting the verdict and the social-media messages only corroborated other evidence. Therefore, we affirm the trial court's judgment.

## BACKGROUND

On May 23, 2018, Xavier's brother, Italio Morales Zarato, arrived at Xavier's apartment. Italio went to the apartment to check on Xavier because their sister had received disturbing messages from Xavier. When Italio arrived, the front door was locked, but a window in the back was open. Italio called the police. Several of Xavier's and Italio's sisters arrived around the same time. Italio climbed into the apartment through the window and found Josselyn Herrera, Xavier's wife, dead on the kitchen floor with Xavier lying on top of her arm, bleeding but still alive.

A grand jury indicted Xavier for the offense of murder, alleging that he intentionally and knowingly caused Josselyn's death by stabbing and cutting her with a sharp-force object. Xavier pleaded not guilty, and the charged offense was tried to a jury.

### Detective Fregia's Testimony

Homicide detective K. Fregia testified at trial. He investigated the crime scene. Josselyn was lying in the kitchen, with a "great amount" of blood surrounding her, and she had a vase with a rose inside in her hand. She had deep cuts in her neck,

2

and there were several bloody knives in the kitchen. Next to the kitchen, there were two cell phones and a notepad on a table, all with blood on them. Detective Fregia testified there was only one door to the apartment, and it had no signs of forced entry and no blood on the outside. There was no blood near or around the back window.

## Medical Examiner's Testimony

Dr. Dwayne Wolf, deputy chief medical examiner for Harris County, also testified at trial. He performed Josselyn's autopsy. He identified the cause of death as multiple sharp-force injuries involving cutting with a sharp-force object. She had two particularly deep incisions on her neck. Dr. Wolf testified that Josselyn had no "hesitation wounds," which are marks that indicate a suicide attempt. She did have defensive wounds—wounds on the hands or forearms that indicate a person tried to block an attack.

## Court Interpreter's Testimony

Irma Mata, a licensed court interpreter, translated some of the evidence from Spanish to English at trial. The notepad found on the table next to the kitchen read:

> Because of this man, all this happened. May God watch over you. Take care of the kids. I hear Falcon was the one. It's her boyfriend in Galveston. He laughed at the picture. My family, I love you. God bless you all and protect you.

Mata also translated several conversations that had been extracted from the cell phones found on the table. Mata provided the following translation of a

conversation the State claims was between Xavier and his sister, Neyli Morales, that took place over Facebook Messenger:

> Neyli Morales: What do you have—what, do you have problems?
>
> Alejandro Martinez: No. You?
>
> Neyli Morales: Because some messages were sent to Patty [their sister]. Weird.
>
> Alejandro Martinez: Oh, yes.
>
> . . . .
>
> Alejandro Martinez: Take care of the girls, sister.
>
> Neyli Morales: You're not with Josse?
>
> Alejandro Martinez: Yes.
>
> Neyli Morales: Yes, I take care of them. And where are you going?
>
> . . . .
>
> Neyli Morales: Patty says if you're having problems.
>
> Alejandro Martinez: No.
>
> Neyli Morales: To return back to the house. What are you—where are you going? That you're leaving and we won't even know where you're going.
>
> Alejandro Martinez: Long, sisters.
>
> Neyli Morales: You've got something that—what are you having problems with that woman? Leave. Leave. I will go back to the house.
>
> Neyli Morales: Of her?
>
> Alejandro Martinez: No. No more. Blocked me.
>
> Neyli Morales: Do not leave to nowhere.

Alejandro Martinez: Rau, you never supported me.

Neyli Morales: Where were—where we're not going to know to where?

Alejandro Martinez: I'm going with mom.

Neyli Morales: Don't say that, brother.

Alejandro Martinez: I will die everybody.

Neyli Morales: What are you going to do? Don't do anything stupid, brother.

. . . .

Neyli Morales: Hey, where are you? Don't you do anything stupid, brother.

Alejandro Martinez: Okay. I love you guys. Take care. (Unintelligible.)

Neyli Morales: You got a missed call from Neyli.

You got a missed call from Neyli.

. . . .

Neyli Morales: Look, Xavier, don't do anything stupid for her. Look, where—look, where are you? Because we're worried about that thing you said, that you were going to my mom.

Neyli Morales: We're going to have to act ourselves.

Alejandro Martinez: Don't worry. Everything will be fine.

Neyli Morales: Well, you don't want to say. I'm going to call the police because I'm not going to permit you to do something crazy.

. . . .

Neyli Morales: You have a missed call from Neyli.

You have a missed call from Neyli.

You have a missed call from Neyli.

You have a missed call from Neyli.

Hey, open.

You have—you have a missed call from Neyli.

Hey, answer or open. We're here outside.

You have a missed call from Neyli.

Neyli Morales: You have a missed call from Neyli.

Oh, did you punish—or did you punish that woman that you don't want to open. Italio, I call the police. Open the door.

You have a missed call from Neyli.

You have a missed call from Neyli.

You have a missed call from Neyli.

Mata also translated a conversation between "Josselin Herrera" and Julio Flores over Facebook Messenger indicating the two were romantically involved:

Julio Flores: I love you.

Josselin Herrera: Later I will tell you what happened to me. Right now I can't.

Julio Flores: You're not hurt?

. . .

Josselin Herrera: No.

Julio Flores: Okay. Kisses, my love.

In another conversation Mata translated, between "Josselin Herrera" and "Alejandro Martinez" over Facebook Messenger, the couple was romantically involved but fighting:

6

Josselin Herrera: What's your fear of them? Just tell them. I—I can love you a lot, but with lies, that's a no, Javi. You always have to invent. I'm not always going to be like that.

Josselin Herrera: I told you. I told you to get rid of that shit that day. Or do you want to see that lady? Tell me. For me—for me, you can leave. I do not complicate myself, but don't give me a runaround.

Alejandro Martinez: Oh, love, how are you? (unintelligible.)

Josselin Herrera: No, Xavier, that's what you wanted, to go back to her.

Alejandro Martinez: You know that I love you. You, my love.

Notably, "Josselin" refers to the other person in this conversation as "Javi," "Xavier," and "Javier" at different times.

Additionally, Mata translated messages over Facebook Messenger between "Josselin Herrera" and Erica Serrato, in which "Josselin" blamed Jose Angel Falco for "ending up like this." Finally, Mata translated a few messages over Whatsapp between "Josselin" and Norma, but "Josselin" states, "Norma[,] it's Xavier." In some of these messages, the sender refers to himself as Javier. The State's theory is that Xavier was using Josselyn's cell phone to send messages to Erica Serrato and Norma after Josselyn died and before he attempted to kill himself.

## DISCUSSION

Xavier's sole issue on appeal is that the trial court erred in admitting the messages extracted from the cell phones found at the scene because the messages were not properly authenticated under Texas Rule of Evidence 901. He claims this

error was harmful because the messages supported the State's theory of murder–suicide and influenced the jury's verdict.

### 1. Applicable law

Texas Rule of Evidence 901 requires a proponent of evidence to authenticate the item by "produc[ing] evidence sufficient to support a finding that the item is what the proponent claims it is." TEX. R. EVID. 901(a). The trial court makes the preliminary determination of whether the proponent has provided sufficient facts to support a reasonable jury finding that the item is authentic. *Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015). We review the trial court's determination for an abuse of discretion and will not overturn the result so long as it is "within the zone of reasonable disagreement." *Id.* Ultimately, the jury must decide whether an item is what the proponent claims it is. *Id.*

Text messages and social-media messages collected from a cell phone may be authenticated like any other item of evidence. *Id.* at 600–01; *see* TEX. R. EVID. 901(a). Authentication may be accomplished "in myriad ways," including witness testimony or evidence of distinctive characteristics, but relying only on the association of a phone number with a particular person "might be too tenuous." *Butler*, 459 S.W.3d at 601. A message sent from a particular number does not establish the identity of the sender because one person can send a message from another person's cell phone. *Id.* Still, circumstantial evidence can authenticate a

conversation. *Id.* at 602. The content and context of a conversation may be sufficient circumstantial evidence to create an inference allowing the jury to conclude a specific person sent the messages. *Id.* at 603; *see also* TEX. R. EVID. 901(b)(4) ("[Evidence that satisfies the authentication requirement includes t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.").

"The erroneous admission of evidence is non-constitutional error." *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018). We must disregard the error unless it affects the appellant's "substantial rights." TEX. R. APP. P. 44.2(b); *Gonzalez*, 544 S.W.3d at 373. Substantial rights are affected when the error "has a substantial and injurious effect or influence in determin[ing] the jury's verdict." *Gonzalez*, 544 S.W.3d at 373. To determine the error's effect on the jury's verdict, we consider: "(1) the character of the alleged error and how it might be considered in connection with other evidence; (2) the nature of the evidence supporting the verdict; (3) the existence and degree of additional evidence indicating guilt; and (4) whether the State emphasized the complained of error." *Id.* After examining the entire record, if we have "fair assurance" that the error did not influence the jury or "had but a slight effect," we will not reverse the conviction. *Id.*

## 2. *Analysis*

### a. *Messages between Xavier and Neyli Morales*

The parties agree that the State relied exclusively on circumstantial evidence to authenticate the messages allegedly between Xavier and his sister Neyli. However, the parties disagree as to whether the circumstantial evidence was sufficient to allow the trial court to admit the messages. Xavier claims the only evidence the State offered to authenticate the messages was the association of names used in the conversations, which, standing alone is "too tenuous" to authenticate a message. *See Butler*, 459 S.W.3d at 601. But the State argues there were additional facts and circumstances to support a jury finding that the messages were authentic. We agree with the State.

Xavier argues that substantially more corroborating evidence was needed for the trial court to admit into evidence the messages the State claims he sent to Neyli Morales.

First, Xavier argues the use of the name "Xavier," by itself, in the conversation is insufficient to indicate the messages were authentic. *See Butler*, 459 S.W.3d at 601. Xavier is correct, but that was not the only fact the State used to authenticate the messages.

Second, he argues the events that took place after the messages were sent did not confirm that he was the one sending those messages. For instance, the sender's

10

expression, "I will die everybody," may have expressed an intent to commit a murder–suicide, which appears to be what Xavier attempted and which could have confirmed he was the sender, or it could have expressed feelings of helplessness and despair, and that helplessness was expressed for all to know: "I will die, everybody." While true, additional events that occurred after the messages were sent helped authenticate the messages.

Third, Xavier argues the content of the messages suggests they were not between Xavier and his sister. Xavier allegedly wrote, "I'm going with mom," and his sister allegedly wrote back, "[W]e're worried about that thing you said, that you were going to my mom." Xavier's and Neyli's mother is dead. The phrasing suggests the two senders did not have the same mother, Xavier argues, otherwise the senders would have said "our mom" instead of "my mom." While a sister may use "our mom" when speaking to her brother, the fact that she refers only to "my mom" does not indicate the person to whom she is speaking is not her brother. Xavier also argues the phrase "You have a missed call from Neyli" could not have been sent by Neyli Morales because there is no reason for her to refer to herself in the third person. But this statement, which was repeated multiple times throughout their conversation, could have been a system notification of a missed call.

The State, in response, identifies additional circumstances that indicate the messages were authentic. The police recovered two bloody cell phones from inside

11

the locked apartment where Xavier and Josselyn lived and were found, and these messages were extracted from one of the phones. There was no indication that any other adults lived in the apartment or were there that day before Italio climbed in the window. The names used in the messages correspond with Xavier, Josselyn, and their known family members. In the conversation allegedly between Xavier and Neyli Morales, Neyli asks for Xavier's apartment number, says she is going to call the police, and asks him to open up because she is outside his apartment—statements that are corroborated by the events that morning: Xavier's siblings showed up outside his apartment and notified the police, who also came to the apartment.

We agree with the State that there was enough circumstantial evidence to support the trial court's preliminary determination to admit the messages allegedly between Xavier and his sister Neyli. *See Butler*, 459 S.W.3d at 600 (trial court makes preliminary determination of whether proponent supplied sufficient facts to support jury determination that evidence is authentic). The trial court did not abuse its discretion in admitting these messages. *See id.* (trial court's decision to admit evidence reviewed for abuse of discretion); *see also Aekins v. State*, No. 04-13-00064-CR, 2013 WL 5948188, at *6 (Tex. App.—San Antonio Nov. 6, 2013) (mem. op., not designated for publication) (name in text message alone insufficient to authenticate message but additional circumstances, including conversations between appellant and others regarding text message, sufficient to authenticate), *aff'd*, 447

S.W.3d 270 (Tex. Crim. App. 2014); *Campbell v. State*, 382 S.W.3d 545, 552 (Tex. App.—Austin 2012, no pet.) (circumstantial evidence connecting defendant to Facebook messages, including content of messages themselves, sufficient to authenticate); *Massimo v. State*, 144 S.W.3d 210, 216–17 (Tex. App.—Fort Worth 2004, no pet.) ("internal characteristics" of e-mail, including fact that e-mail was sent shortly after altercation and referenced altercation, sufficient to authenticate).

### b. Other Messages

The State also introduced conversations allegedly between Xavier and Josselyn, between Josselyn and someone named Julio Flores, between Josselyn and Erica Serrato—the name of one of Xavier's sisters, and between Josselyn and Norma—the name of another sister. These messages were also extracted from the cell phones found in the apartment. For these messages, Xavier argues the State did not even present circumstantial evidence to authenticate them. The only connection between the messages and the alleged senders, Xavier argues, is the evidence linking the cell phones themselves to Xavier and Josselyn—the fact that they were found in Xavier's and Josselyn's apartment. He argues evidence that messages have been extracted from a person's phone, without more, is too tenuous to authenticate the messages. *See Mata v. State*, 517 S.W.3d 257, 266–67 (Tex. App.—Corpus Christi–Edinburg 2017, pet. ref'd) (mem. op.) (affirming trial court's exclusion of text messages from cell phone belonging to complainant when proponent provided "no

13

evidence of any distinctive characteristics found in the text messages that would associate [the complainant] with the phone and any text message").

While the circumstances presented enough facts to allow the trial court to admit the messages allegedly between Xavier and Neyli, we agree with Xavier that the State did not provide sufficient facts to authenticate these additional conversations. As with the messages between Xavier and Neyli, the State points to the facts that the messages were extracted from cell phones found in the locked apartment and contained the names that matched Xavier's family members. But the only other fact the State identifies to connect Xavier or Josselyn with the messages themselves is that one message refers to "Angel Falco," which matched the name written on the notepad found in the apartment.[1] This is not sufficient evidence to support a reasonable jury finding that Xavier or Josselyn sent or received the messages in question, and we agree with Xavier that the trial court abused its discretion in admitting these messages. *See Butler*, 459 S.W.3d at 600.

Having concluded the trial court erred in admitting these messages, we must review the entire record to determine whether the error affected Xavier's substantial rights. *See Gonzalez*, 544 S.W.3d at 373.

---

[1]     The State alleges that Xavier sent the message about Angel Falco from Josselyn's cell phone, which is why the name appearing in that conversation is Josselyn's. This allegation highlights the importance of authenticating messages extracted from a cell phone, as one person can easily send a message from another person's phone.

14

*i. Character of the error*

The trial court's error was admitting messages that were not properly authenticated. The State used the messages allegedly between Xavier and Josselyn to establish the couple was having serious issues, and it used the messages allegedly between Josselyn and Julio Flores to show that Josselyn was having an extramarital affair. The messages established a motive for the crime. Yet the messages did not provide direct evidence that Xavier committed the murder, and the jury could not reasonably have found Xavier guilty based on these messages alone.

*ii. Nature of evidence supporting verdict and additional evidence supporting the verdict*

Again, the erroneously admitted messages established a motive for the crime but did not directly or circumstantially evidence Xavier's guilt. Viewing the entire record, there was enough circumstantial evidence for the jury to reasonably find Xavier guilty, even without considering the unauthenticated messages.

First, Xavier and Josselyn were found covered in blood in their locked apartment. Both had been cut by knives, and there were multiple bloody knives in the kitchen. They were the only adults in the apartment. There was no blood on the outside of the front door, and there was no blood around the open window, suggesting that the assailant did not leave the apartment. Josselyn had no hesitation

15

wounds, and she had defensive wounds on her hands, suggesting she did not kill herself.

Second, the police found what appeared to be a suicide note on the kitchen table. This note established a motive—Josselyn had a boyfriend in Galveston—and it indicated Xavier's intent to die, as did his authenticated messages to his sister Neyli: "I'm going with mom," and "I will die everybody." Neyli asked if Xavier was having problems with Josselyn, suggesting she knew the couple had a problematic relationship.

Xavier argues there was no direct evidence supporting the verdict. He points out that the State presented no eyewitnesses to the murder and that there was no physical evidence connecting him to the crime, such as his fingerprints on the knives. He made no incriminating statements, and the messages attributed to him did not express guilt. Even without the direct evidence Xavier describes, there was significant circumstantial evidence indicating his guilt.

Xavier also argues that the unauthenticated messages helped advance the State's theory of murder–suicide. We agree, but we also think there was enough additional evidence that the jury could have believed the murder–suicide theory without the unauthenticated messages. Xavier argues these unauthenticated messages helped the State undermine potential defenses that he could have offered, such as a third party committing the murder. But Xavier did not present this defense.

16

*iii. Whether State emphasized complained-of error*

Xavier argues, without elaboration, that the State emphasized the unauthenticated messages in its closing argument. We disagree. The State mentioned the messages in its closing argument, but only as part of the timeline of events that occurred that day. The State chose to split its closing argument, and in the first part, counsel did not mention the messages at all. Then, in the defense's closing argument, counsel brought up the messages in the context of creating reasonable doubt:

> What is reasonable doubt? Reasonable doubt is we don't know who sent the text messages they have—they just read to you. Who misspells their own name over and over and over? No one.

Counsel for the State then addressed the misspelling in the second part of its closing argument:

> And then there was some discussion about, well, Xavier's name is sometimes J, and it's sometimes X. And who would misspell their own name? Well, his family members in the text messages calling him Xavier or Javier. And when Josselin who was in a serious relationship with him is sending messages on the phone, she calls him Javier with a J sometimes. It seems to be an interchangeable name for him. And we know that he was the subject of those text messages, because we can see how they match up to what happened that morning and what we saw in that apartment.

Later, counsel again referenced the messages:

> There was a lot of messages that you painfully had to listen to and hear read to you from Neyli and other family members. Ceasa and—Ceasa and Patty. I think if you look at the messages titled Erica Serrato, sometimes there is a reference to Patty. We know this message, both messages are from this man. And they were from this man because he was finishing up after what he had done to her so that he could end it

17

all in this location. You have seen this a lot of times. A lot of different angles.

Counsel referenced the messages again as part of the timeline of Xavier's actions that day:

> [H]e viciously attacked her with multiple sharp objects . . . until she was dead. And after that, he goes around the apartment, ties up some loose ends, leaves messages, chats on phones to his family members, . . . and then he lays down on his arms, cuts his own throat.

Counsel also went into a detailed discussion about the time stamps on the messages and how those time stamps fit into the State's theory of the timeline of events that occurred on the morning Josselyn was killed. Although counsel argued that Xavier sent the messages, counsel did not claim the messages evidenced his guilt, nor did the content of the unauthenticated messages connect Xavier to the murder. The content of these unauthenticated messages helped establish the motive of the attempted murder–suicide, but so did the notepad containing the apparent suicide note at the scene of the crime. The unauthenticated messages only corroborated this theory. The unauthenticated messages did not provide evidence of Xavier's guilt, but, as we discussed above, there was additional evidence indicating his guilt, and this is what the State emphasized in its closing argument.

Having reviewed the entire record, we have fair assurance that the error in admitting the unauthenticated messages either did not influence the jury or had only

18

a slight effect. *See Gonzalez*, 544 S.W.3d at 373. Therefore, we must disregard the error. *See* TEX. R. APP. P. 44.2(b); *Gonzalez*, 544 S.W.3d at 373.

We conclude that the trial court did not err in admitting the messages allegedly between Xavier and Neyli Morales, and, although the trial court erred in admitting the other conversations because they were not authenticated, the error did not affect Xavier's substantial rights. Xavier's sole point of error is overruled.

## CONCLUSION

We affirm the trial court's judgment.

Gordon Goodman
Justice

Panel consists of Justices Goodman, Countiss, and Farris.

Do not publish. TEX. R. APP. P. 47.2(b).