**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-22-00072-CR**
_____

**MANKA ALONZO MELSON JR., Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 163rd District Court
Orange County, Texas
Trial Cause No. B210176-R**

**MEMORANDUM OPINION**

Appellant Manka Melson was convicted of capital murder of his former girlfriend.[1] He was sentenced to life imprisonment, without the possibility of parole, in the Institutional Division of the Texas Department of Criminal Justice. Tex. Pen. Code Ann. § 19.03(a)(2). In two issues on appeal, he challenges his conviction. First,

_____

[1] In a companion case, Appellant was also charged with the capital murder of his former girlfriend's then current boyfriend.

1

Appellant complains that telephone records admitted over objection were not authenticated and were inadmissible hearsay. Second, Appellant complains that the trial court erred by assessing reimbursement of court-appointed attorney's fees against an indigent defendant. We affirm the judgment of conviction as revised to strike that part of the judgment assessing attorney's fees against Appellant, an indigent defendant.

## I. Background

During the early morning hours of January 23, 2021, eighteen-year-old Aurora Gibson and her boyfriend were fatally shot in the home she shared with her parents and her two siblings.[2] After receiving a 9-1-1 call, the police responded to find two victims both with gunshot wounds inside the home. It appeared someone had entered the home through the kitchen window and shot both Aurora and her boyfriend. Aurora had once been in a dating relationship with Appellant. Appellant reportedly had been depressed over the breakup of their relationship. The police conducted an investigation and later Appellant was charged and tried for the murder

---

[2] We refer to the victims, their family members, and the civilian witnesses by pseudonyms to conceal their identities. *See* Tex. Const. art. I, § 30 (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process[.]"). *See Smith v. State*, No. 09-17-00081-CR, 2018 WL 1321410, at *1 n.1 (Tex. App.—Beaumont Mar. 14, 2018, no pet.) (mem. op., not designated for publication).

of Aurora. The jury found Appellant guilty of capital murder, and he timely filed a notice of appeal. We summarize below the evidence relevant to this appeal.

**Detective Hilyar's Testimony**

Detective Sergeant Theodore Hilyar Jr., an employee of the Orange Police Department, outlined his law enforcement education and experience, noting that he has received specialized training in cell phone technology, which enables him to extract data from cell phones for use in law enforcement operations. He has performed this function for approximately eight years. Hilyar described the different software used to duplicate the information on a cell phone or to map a phone's location by the phone's proximity to and direction from various cell towers.

Pursuant to a search warrant, Hilyar downloaded and analyzed the information from Aurora's phone. As he was reviewing the text messages, he noticed that there were over 10,000 text messages between Aurora and someone identified in the phone as "Allison," but whom he later ascertained was Appellant. Hilyar also obtained a search warrant for Appellant's phone, and according to standard practice, e-mailed it to the service provider's secure law enforcement portal. After receiving the location data regarding both phones, Hilyar transferred the information into the mapping program, and consequently learned that from 9:00 p.m. on January 22 until 3:05 a.m. on January 23, Appellant's phone traveled from Vinton, Louisiana, through Orange, Vidor, Beaumont, Winnie, and Baytown, apparently along

Interstate 10, before arriving at a location in northwest Houston shortly after midnight. The phone then reversed direction, and travelled south and east, connecting to cell towers in Orange at 1:47 a.m. There was no more data transmitted from the phone until 2:55 a.m., when it connected to a tower in Vinton. Hilyar believed that this gap in the data was due to the phone having been turned off; he acknowledged that a dead battery could have caused the same result but noted that other data indicated that the phone battery was sufficiently charged during this time frame. The map of Aurora's phone revealed a similar travel path to and from northwest Houston, where she and her new boyfriend "Tom Little" had chosen to obtain tattoos. The timing of the connections to cell phone towers revealed that Appellant's phone was travelling only a few minutes behind Aurora's phone, which arrived back in Orange at 1:47 a.m.

Hilyar also testified regarding the content of the text message exchanges he downloaded from Aurora's phone. Based on the content of those messages, including the references to getting tattoos and the fact that the participants referred to each other by name, he concluded that the text messages were between Aurora and Melson. Although Hilyar never obtained the cell phone Appellant was using until January 23, he later obtained and searched the phone taken from Appellant at

4

the time Appellant was taken into custody.[3] That search yielded a few days of text messages with a beginning date of January 25, 2021, two days after the murders.

**Detective Laughlin's Testimony**

Jason Laughlin, a detective with the Orange Police Department, outlined his law enforcement background and the assistance he provided during the initial stages of the investigation.

Two days after the murders, Laughlin interviewed Appellant. During that interview, Appellant did not visibly express emotion, but referred to Aurora as "the love of his life[,]" and stated that he hoped to rekindle their previous romantic relationship. During this interview, Appellant also mentioned his communication with Aurora during the time leading up to her murder and revealed that he was aware that she planned to go to Houston to get a tattoo, that he had been told of the rumors that he had killed Aurora and Tom, and that "the police had video evidence of him at the house." Appellant also stated that he went to Baytown on the evening of January 22 to sell his car, a white Buick sedan, but the deal fell through. Appellant then stated that he had sold his car to a woman in Houston but did not know her name and had no paperwork as evidence of the sale. The vehicle was later located in the possession of a woman living in Vinton, Louisiana. Appellant also denied having

---

[3] The record indicates that these were two different phones, as shown by the different model numbers.

been to Aurora's house in Orange. Detective Laughlin also took a DNA sample from Appellant and submitted it for processing.

**Detective Ashworth's Testimony**

After describing his training and experience in law enforcement and summarizing his actions at the crime scene, Detective Captain Jason Ashworth, of the Orange Police Department, detailed his review of the 10,140 text messages between Appellant and Aurora that were downloaded from Aurora's phone. These messages were sent between December 2, 2020, and January 23, 2021, the date of Aurora's death. He noted that Aurora and Appellant often addressed each other by name and that Appellant was confronting Aurora about the status of their relationship. In particular, the text messages indicated that Appellant frequently became upset if Aurora did not promptly respond to his messages and accused her of pursuing a relationship with someone else. Appellant also threatened to harm himself and others, and his texts showed he may be following Aurora. Appellant also asked Aurora invasive personal questions, and repeatedly called her "the love of [his] life." On January 22nd, the day before the murder, Appellant was asking Aurora detailed questions about her planned trip to Houston, including her expected time of departure and whether she intended to spend the night in Houston or at her home in Orange.

**Amy Gibson's Testimony**

Gibson, Aurora's mother, described the events of January 22nd and 23rd. She recalled that on the evening of the 22nd, Aurora and her new boyfriend Tom went to Houston to get tattoos. They left Orange at approximately 5:00 in the afternoon for their 7:30 appointment at the tattoo shop. She fell asleep and did not hear Aurora and Tom come back to the house. Sometime later, her husband woke her to ask about an unusual noise and Amy detected the smell of gunpowder. She also noticed that the blinds covering the kitchen window were askew and the window curtain was missing. Amy then discovered Tom's body on the bathroom floor and Aurora lying in her bed with a gunshot wound to her head. Police and emergency medical technicians were summoned to the scene; when they determined that Aurora was still alive, they transported her to a hospital where she later died.

Amy noted that the chair beneath the kitchen window was out of place. She testified that she did not know that her daughter had been in a relationship with Appellant. Amy had told her daughter five years earlier (when her daughter was thirteen) that she did not approve of Appellant, and he was too old for her daughter.

**Testimony of Ted Peterson, Brenda Finley, and Rhonda Wagner**

Peterson and his fiancée, Brenda Finley, permitted Appellant to live in their home after Appellant was displaced by Hurricane Laura. The morning that they learned of Aurora's death, Peterson was speaking with Appellant, who confirmed

that he had been exchanging text messages with Aurora the previous night. Appellant also asked about Aurora's boyfriend, which struck Peterson as odd.

Finley generally confirmed Peterson's testimony. Finley recalled that after Peterson left for work, and after Appellant spoke to some neighbors, Appellant returned and hurriedly packed his belongings and left the house, stating that he had to leave because "[t]hey got me on camera."

Wagner was at the Peterson-Finley home on the morning of January 23rd. She described Appellant as "frantic" after speaking with his neighbors, and recalled that while he was packing to leave the house, he stated "[t]hey're saying they got me on camera. . . . I don't know how that happened." Peterson, Finley, and Wagner testified that as of January 22 and 23, Appellant was driving a white Buick.

**Autumn Franklin's Testimony**

Franklin, Aurora's cousin, testified that she learned of Aurora's death on the morning of January 23rd. Upon hearing that information, Franklin immediately suspected Appellant, because not only had Appellant been asking questions about Aurora's activities and location, but also Aurora was afraid of Appellant.

**Other Testimony from Law Enforcement Employees**

Timothy Pruitt, Nicholas Medina, Logan Holland, and Joseph Steele, employees of the Orange Police Department, also testified. Each one described their

8

observations at the scene, their involvement with the investigation, and authenticated multiple photographs of the crime scene.

**Neighbors' Testimony**

Five neighboring property owners testified. The neighbors authenticated the images taken from their home security cameras. One of these individuals testified that the images downloaded from his security system showed that at 1:50 a.m. on January 23rd, a white car pulled into the driveway of his unoccupied house; this car left at about 2:30 that same morning.

**Ethan Hunt's Testimony**

Hunt, the principal of Vinton High School, authenticated the security video of the January 22nd basketball game and parking lot activity. Appellant attended the game, as shown by both the video and Hunt's testimony. Appellant left the school premises at approximately 9:00 p.m.

**Detective Henry's Testimony**

Detective Isaac Henry III, of the Orange Police Department, reviewed the security videos obtained from the neighboring homeowners and businesses and described the content of these videos for the jury. While playing the various video clips for the jury, Henry identified the arrival of Aurora's vehicle at 1:41 a.m. and the appearance of a white Buick believed to be Appellant's car roughly five minutes later pulling into the driveway of a house near the crime scene. Thereafter, the video

9

shows an individual walking west, a single loud noise believed to be a gunshot, and two more such noises, also believed to be gunshots.[4] The video footage then shows a figure running in the opposite direction, and the same white car backing out of the driveway and leaving the area at "a high rate of speed" without stopping at a stop sign.

**Sergeant Steven Ward's Testimony**

Ward, like Henry, reviewed the security video evidence. He identified features of the white Buick from the video footage that were consistent with the white Buick Appellant was known to have owned. In particular, Ward noted that the vehicle shown in the video clips had after-market glass tinting, high-definition headlights, and Vogue tires. Ward explained that all of these features were consistent with Appellant's vehicle.

**Cox and Dean Testimony**

Marsha-Jean Cox, of the Jefferson County Crime Laboratory, and Tanya Dean, with the Department of Public Safety laboratory, testified and described the collection and testing of evidence for DNA analysis. With particular reference to a patio chair that had been placed under the kitchen window, Cox testified that she swabbed the arms and back of the chair for DNA evidence, and Dean testified that

---

[4] Other witness testimony reveals that Aurora was shot once and Tom was shot twice.

her analysis of those swabs indicated that it was 84,600 times more likely that the DNA specimen found on the chair came from Appellant than from an unknown, unrelated individual.[5]

Dean also described the evidentiary significance of DNA, the laboratory process of analyzing it, and explained that the ability to obtain identifiable DNA evidence depends on many factors, including the weather, the type of surface from which the evidence is collected, and the individual donor involved. She further testified that other than the swabs gathered from the chair, the swabs yielded no potentially helpful information, as they either showed no other identifiable DNA or excluded Appellant's DNA profile.

**Other Evidence**

Documents, videos, reports, and other items were admitted into evidence which included multiple photographs, security video excerpts, maps of the area, search warrants, DNA swabs, bullet fragments, cell phone records, and a printout of many of the text messages from Aurora's and Appellant's cell phones.

---

[5] This figure came from Dean's comparison with a specimen obtained from a water bottle Appellant used. Dean's comparison of the sample from the chair with Appellant's cheek swab yielded the figure that the DNA obtained from the chair was 68,500 times more likely to have come from Appellant than from an unknown, unrelated individual.

## II. Standard of Review Regarding Evidentiary Challenge

We review the trial court's admission of evidence for an abuse of discretion. *See Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010); *Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009). A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *See Martinez*, 327 S.W.3d at 736; *Layton*, 280 S.W.3d at 240. In addition, we uphold the ruling on the admission of evidence if it was correct on any theory of law supported by the record and applicable to the case, in light of what was before the trial court at the time the ruling was made. *See State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002); *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000); *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

## III. Analysis of Evidentiary Challenge

Appellant challenges the admission of certain evidence raising two objections. First, he challenges the cell phone records because he contends a proper predicate was not laid, they were not properly authenticated, and there was no business records affidavit. Second, he argues the cell phone records were inadmissible hearsay.

**Authentication**

Authentication requires only "evidence sufficient to support a finding that the item is what the proponent claims it is." Tex. R. Evid. 901(a); *Butler v. State*, 459

S.W.3d 595, 605 (Tex. Crim. App. 2015). The authentication "can be accomplished in a myriad of ways, depending upon the unique facts and circumstances of each case, including . . . through evidence showing distinctive characteristics." *Id.* at 601. The authentication methods listed in Rule 901(b) are not exhaustive; authenticating evidence need not exhibit any particular form or content, so long as the "fact-finder could rationally choose to believe the sponsoring witness, and the witness's testimony would establish that the item proffered 'is what its proponent claims[,]' the trial court will not abuse its discretion to admit it." *Id*. at 605. The authenticating evidence may be either direct or circumstantial. *Id*. at 602.

## A. The Text Messages

Appellant argues that the text messages retrieved from Aurora's phone were not authenticated by the service provider's records custodian. .

The Rules of Evidence do not limit the method of authentication of evidence to a business record affidavit. *See* Tex. R. Evid. 901(b)(4); *Butler,* 459 S.W.3d at 600-05. Instead, the controlling authorities recognize that "distinctive characteristics" may be sufficient to demonstrate that "the item proffered 'is what its proponent claims[.]'" Tex. R. Evid. 901(a), (b)(4); *Butler*, 459 S.W.3d at 600-01. One such characteristic is the demonstrated association between Appellant and the phone number in question, to which Hilyar testified. *Id.* at 601. This association, standing alone, is insufficient to show that Appellant authored the text messages

13

attributed to him, because as the Court of Criminal Appeals observed, "'cell phones can be purloined,' and a cell-phone number does not necessarily establish the identity of the user at a particular moment in time[.]" *Id.* at 601. That said, we conclude that there is additional evidence in the record that provides additional "distinctive characteristics" tending to link Appellant to the cell phone registered in his name. *Id*. at 602.

Appellant admitted to Peterson that he had texted Aurora on the evening of January 22nd. During the text message exchanges, Appellant and Aurora called each other by name several times. In addition, as Laughlin explained, Appellant gave a voluntary interview. During that interview, Appellant called Aurora the love of his life, and expressed both disappointment in their breakup and the desire to revive their romantic relationship. These statements corroborate and further link Appellant to messages from the cell phones. In one text message sent from Appellant's phone to Aurora's phone Appellant stated "[Aurora] I love you I just can't see you with someone else that will break me like it really will you are all I want in life[,]" and another stated, "I lost the love of my life I don't want nobody else but you and I can't have you." There is also a text message that reads "you know how bad that hurts after almost 5 years the love of my life tells me she doesn't know if she wants to be with me[.]" On January 23, a text message states "your family doesn't like me." The uncontradicted evidence identifies Appellant as a former boyfriend who recently had

14

ceased dating Aurora after a five-year relationship, and further reveals that Appellant knew Aurora's mother did not approve of the relationship. The content of the text messages is sufficient to authenticate Appellant as the sender. The trial court acted within its discretion in concluding that the state produced evidence sufficient to support a finding that the text messages were authored by defendant, satisfying the threshold requirement under the authentication rule. Tex. R. Evid. 901(a); *See Butler v. State*, 459 S.W.3d 595, 604-05 (Tex. Crim. App. 2015). *See Alexander v. State*, No. 14-17-00392-CR and 14-17-00393-CR, 2018 Tex. App. LEXIS 9231, *16 (Tex. App.—Houston [14th Dist.] 2018, pet ref'd) ("A proponent must only produce sufficient evidence from which a reasonable fact-finder could properly find genuineness and need not prove beyond any doubt that the evidence is what it purports to be[]" citing *Campbell v. State*, 382 S.W.3d 545, 549 (Tex. App.—Austin 2012, no pet.); *see also Cook v. State*, 460 S.W.3d 703, 712 (Tex. App.—Eastland 2015, no pet.); *Manuel v. State*, 357 S.W.3d 66, 74 (Tex. App.—Tyler 2011, pet. ref'd).

## B. Hearsay Objection

As explained above, the trial court properly overruled the "predicate" objection. Next, we consider Melson's objection that the text messages constituted hearsay. Melson admitted in his interview after the murders that he was sending text messages to Aurora. He admitted during questioning that he had expressed his

15

concerns to Aurora about their relationship. We cannot say the trial court abused its discretion in overruling the hearsay objection. The trial court could have concluded the text messages were admissions made by Melson. Tex. R. Evid. 801(e)(2)(A); *see Trevino v. State,* 991 S.W.2d 849, 853 (Tex. Crim. App. 1999) (Rule 801(e)(2)(A) plainly and unequivocally states that a criminal defendant's own statements, when being offered against him, are not hearsay).

## C. The Location Data

As with the text messages, Appellant also objected that the cell phone location data was inadmissible because it was not properly authenticated and because it was hearsay. The trial court overruled the objections. Hilyar's testimony established that the location information came directly from the cell phone service provider, through that provider's secure law enforcement portal. Hilyar testified to his specialized training and knowledge in obtaining and mapping cell-phone data to establish locations. Hilyar compared this data with other information obtained from the cell phone which confirmed the data. His verification of the location data included using Aurora's cell phone records and other evidence in the case. This type of independent corroboration supports the trial court's finding of reliability. *See Wells v. State*, 675 S.W.3d 814, 830 (Tex. App.—Dallas 2023, pet. granted) (citing *Alyea v. State*, No. 14-19-00498-CR, 2021 Tex. App. LEXIS 9015, at **3-5 (Tex. App.—Houston [14th Dist.] Nov. 4, 2021, pet. ref'd) (mem. [**30] op., not designated for

publication). The trial court could have concluded that the testimony sufficiently authenticated the location data, because it enables the trier of fact to determine "that the proffered evidence is what the proponent claims it to be[.]" *Campbell,* 382 S.W.3d at 547; *Alexander*, 2018 Tex. App. LEXIS 9231, at *15.

With respect to Appellant's hearsay argument, the trial court could have concluded that the location data was not hearsay because the definition of hearsay requires an out-of-court statement by a declarant, and the data from the service provider's portal or computer is not considered a declarant for purposes of the hearsay rule. *See* Tex. R. Evid. 801(d); *See Nguyen v. State*, No. 05-20-00241-CR, 2022 Tex. App. LEXIS 6533, at **16-21 (Tex. App.—Dallas Aug. 29, 2022, pet. ref'd) (not designated for publication) (data downloaded from a vehicle's event data recorder, commonly called a "black box," was not subject to a hearsay exception because the event data recorder was not a declarant). We overrule the Appellant's first issue.

### IV. The Fee Assessment

The State agrees that it was error for the trial court to assess attorney's fees against Appellant, an indigent offender. We sustain Appellant's second point, and reform the judgment of conviction to remove the assessment of attorney's fees.

## V. Conclusion

To summarize, we cannot say the trial court erred in overruling the defendant's objections as to the text messages and location data. So, we overrule the Appellant's first issue. As to his second issue, because Appellant was declared indigent, it was error for the trial court to assess attorney's fees against him. We also note that the trial court's judgment contains a clerical error because it incorrectly states that Melson was charged and convicted of an offense under section 19.03(a)(7) of the Texas Penal Code, whereas the jury's verdict reflects that he was convicted of a violation of section 19.03(a)(2) of the Texas Penal Code. *See* Tex. Penal Code Ann. § 19.03(a)(2). This Court has the authority to modify the trial court's judgment to correct clerical errors. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27-28 (Tex. Crim. App. 1993). Accordingly, we modify the trial court's judgment to remove the assessment of fees and to reflect that Melson was convicted of violating section 19.03(a)(2) of the Texas Penal Code.

AFFIRMED AS REFORMED.

JAY WRIGHT
Justice

Submitted on April 20, 2023
Opinion Delivered June 12, 2024
Do Not Publish

Before Golemon, C.J., Johnson and Wright, JJ.

18