# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-11-00834-CR

**Travis Campbell, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 403RD JUDICIAL DISTRICT
### NO. D-1-DC-11-904083, HONORABLE BRENDA KENNEDY, JUDGE PRESIDING

### O P I N I O N

A jury convicted appellant Travis Campbell of aggravated assault with a deadly weapon. *See* Tex. Penal Code Ann. § 22.02 (West 2011). Pursuant to an agreement with the State regarding punishment, the trial court sentenced Campbell to four years' imprisonment. In his sole issue on appeal, Campbell argues that the trial court erred by improperly admitting Facebook messages that the State contended were created by Campbell. We affirm the judgment of the trial court.

### BACKGROUND

At the time of the incident giving rise to Campbell's arrest, Campbell was sharing a house with his girlfriend, Ana B., and her two young children.[1] On February 26, 2011, the night

---

[1] We refer to complainant by her first name in order to protect her identity.

before the incident, the couple had gone out for dinner and drinks at a local restaurant. At trial, Ana and Campbell presented wholly different accounts of the events following that outing.

According to Ana, Campbell became upset during dinner when Ana received a Facebook message on her phone from one of Campbell's male friends. Following dinner, the couple returned home, and Campbell continued to question Ana about the message. Eventually, Campbell left to go to a party while Ana remained at the house. Ana testified that when Campbell returned, at approximately four in the morning, he woke her and began questioning her again about the Facebook message.

In response to Campbell's questioning, Ana told Campbell to leave and tried to push him off the bed with her feet. According to Ana, Campbell then took off his clothes and approached Ana suggesting he wanted to have sex with her. When Ana resisted, Campbell hit her several times in her face and chest with her cell phone. Ana testified that Campbell then left the room and came back with a two-pronged fork and a knife. Holding the fork to Ana's side, Campbell told Ana to text a profane message to the male friend who had sent Ana the earlier message. Campbell hit Ana in the face with the handle of the fork when she refused. Ana recalled at trial that Campbell also held a knife to her neck and threatened to kill her if she did not "lick his ass." Ana testified that when she refused, Campbell forced her to have vaginal, anal, and oral sex with him. Afterwards, according to Ana, Campbell threatened Ana's life and hit her repeatedly until she blacked out. When she awoke, Ana grabbed some clothes, kicked a screen off her bedroom window, and jumped out. Ana then ran to her neighbor's house, who upon her request drove her to her aunt's house a few miles away. Shortly thereafter, Deputy Rick Lane with the Travis County Sheriff's Office arrived at Ana's aunt's house, and Ana reported to Lane that she had been sexually assaulted by Campbell.

2

The next day, Ana went to Saint David's Hospital so that a sexual assault examination could be performed. Julie Gibbs, the sexual assault nurse examiner, testified that Ana had "quite a large amount of injuries, majority to her face, [and] multiple lacerations." Gibbs testified that Ana had lacerations on her nose and the side of her face, redness to her breast, bruising on her neck and left arm, broken capillaries in the back of her throat, and redness to the vaginal area. Gibbs also stated that the bruise on Ana's arm had three little scabs in the center and that Ana had told her "this was from a kitchen two-prong fork."

At trial, Campbell took the stand in his own defense and told a very different story. Campbell acknowledged that he and Ana were arguing when they went out for dinner. However, Campbell testified that the argument had begun the night before, when Ana had left her children with him but did not return when she said she would. According to Campbell, Ana was angry with him during dinner because he had threatened to end their relationship over the matter.

According to Campbell, he and Ana went home after dinner and had consensual sex. Campbell denied that he ever forced Ana to have sex. Campbell testified that when he returned home from the party, Ana was intoxicated and mad at him for threatening to end their relationship. Campbell stated that Ana then retrieved the meat fork from the kitchen, held it up to him, and began to hit him in the face. Campbell admitted striking Ana, but explained that he did so only after she had repeatedly hit him. Campbell testified that he then left the house and Ana followed him, falling and injuring herself on the exterior stairs, as he drove away.

At the conclusion of trial, the jury found Campbell "not guilty" of all three counts of aggravated sexual assault as alleged in the indictment. *See* Tex. Penal Code Ann. § 22.021 (West

2011). However, the jury found Campbell guilty of one count of aggravated assault with a deadly weapon, a fork.[2] *See id*. § 22.02. In accordance with the State's agreement with Campbell, the court imposed a sentence of incarceration for four years. This appeal followed.

In his sole issue on appeal, Campbell complains that the trial court erred in admitting evidence that was not properly authenticated and was harmful to his defense. Specifically, Campbell contends that the trial court erred in admitting a printout of Facebook messages purportedly sent by Campbell to Ana and identified at trial as State's Exhibit 14. Campbell argues that the only authentication evidence presented prior to the admission of the exhibit was Ana's testimony that she received these Facebook messages from Campbell a few days after the alleged assault, that she did not send them to herself, and that she did not have access to Campbell's Facebook account after the incident. Campbell asserts that there is no evidence that the messages are in fact from his Facebook account. Campbell contends that the trial court's admission of these messages was harmful error because the exhibit was "a crucial piece of evidence establishing the aggravated assault with the fork."

The State counters that the trial court did not err in admitting the Facebook messages because the State presented sufficient evidence to support a finding that the messages were sent by Campbell. Alternatively, the State contends that if there was any error in admitting the messages, it was harmless.

---

[2] Campbell was also charged with another count of aggravated assault with a knife as deadly a weapon, but the jury found him "not guilty" of this count. *See* Tex. Penal Code Ann. § 22.022 (West 2011).

4

## APPLICABLE LAW AND STANDARD OF REVIEW

Under rule 104(a) of the Texas Rules of Evidence, whether or not to admit evidence at trial is a preliminary question to be decided by the court. Tex. R. Evid. 401(a); *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). Only relevant evidence is admissible. Tex. R. Evid. 401, 402. The issue of authentication—that the proffered evidence is what the proponent claims it to be—arises when "the relevancy of any evidence depends upon its identity, source, or connection with a particular person, place, thing, or event." *Shea v. State*, 167 S.W.3d 98, 104 (Tex. App.—Waco 2005, pet. ref'd). Evidence has no relevance if it is not authentically what the proponent claims it to be. *Tienda*, 358 S.W.3d at 638.

The requirement of authentication or identification is a condition precedent to admissibility and is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims it is. Tex. R. Evid. 901(a). Whether the proponent of evidence has satisfied the threshold requirement of authenticity is one of the preliminary questions to be decided by the court. *Tienda*, 358 S.W.3d at 638. However, rule 901 "does not erect a particularly high hurdle, and that hurdle may be cleared by circumstantial evidence." Peter T. Hoffman, *Texas Rules of Evidence Handbook*, Article IX at 948 (8th ed. 2008-09) (quoting *United States v. Chin*, 371 F.3d 31, 37 (2d Cir. 2004)). The proponent of evidence does not need to "rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *Id*. In fact, in performing its gate-keeping function under rule 104, the trial court itself need not be persuaded that the proffered evidence is authentic. *Tienda*, 358 S.W.3d at 638. Rather, the ultimate question of whether an item of evidence is what the proponent claims is a question for the

5

fact finder. *Id.* In a jury trial, the preliminary question for the trial court to decide is simply whether the proponent of the proffered evidence has supplied facts that are sufficient to support a reasonable jury determination that the evidence is authentic. *Id.*; *see also Manuel v. State*, 357 S.W.3d 66, 74 (Tex. App.—Tyler 2011, pet. ref'd) ("The proponent must only produce sufficient evidence that a reasonable fact finder could properly find genuineness.").

An appellate court reviews a trial court's decision as to whether evidence is properly authenticated for an abuse of discretion. *Tienda*, 358 S.W.3d at 638. A trial court does not abuse its discretion when it reasonably believes that a reasonable juror could find that the evidence has been authenticated. *Druery v. State*, 225 S.W.3d 491, 502 (Tex. Crim. App. 2007). If the trial court's ruling is at least "within the zone of reasonable disagreement," we will not interfere. *Id.*

## DISCUSSION

Rule 901 of the Texas Rules of Evidence provides a nonexclusive list of methods for authentication of evidence. *See* Tex. R. Evid. 901. For example, evidence may be authenticated by testimony from a witness with knowledge that a matter is what it is claimed to be. *Id.* R. 901(b)(1). Evidence may also be authenticated by "appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." *Id.* R. 901(b)(4). In the context of communications, the authentication issue that generally arises is whether the evidence is sufficiently linked to the purported author. With respect to electronic communications—such as e-mails, text messages, and as in this case, Facebook—the rules of evidence, including rule 901, are considered at least generally "adequate to the task." *See Tienda*, 358 S.W.3d at 638. Printouts of

emails, internet chat room dialogues, and text messages have all been admitted into evidence when found to be sufficiently linked to the purported author so as to justify the submission to the jury for its ultimate determination. *See id*. at 639.

However, in evaluating whether an electronic communication has been sufficiently linked to the purported author, we recognize that electronic communications are susceptible to fabrication and manipulation. *See id*. at 641 (explaining that some courts, "mindful that the provenance of such electronic writings can sometimes be open to question," have held that prima facie authenticity was not demonstrated). For example, social networking websites, such as Facebook and MySpace, allow users to establish an online account, create a profile, and then invite others to access that profile as a "friend." *See Doe v. MySpace, Inc*., 474 F. Supp. 2d 843, 845-46 (W.D. Tex. 2007); *see also Griffin v. State*, 19 A.3d 415, 420-21 n.6 (Md. 2011) (noting that MySpace and Facebook work in same way). Accordingly, with respect to identity, Facebook presents an authentication concern that is twofold. First, because anyone can establish a fictitious profile under any name, the person viewing the profile has no way of knowing whether the profile is legitimate. *Griffin*, 19 A.3d at 421 (citing David Hector Montes, *Living Our Lives Online: The Privacy Implications of Online Social Networking*, J.L. & Pol'y for the Info. Soc'y, Spring 2009, at 507, 508). Second, because a person may gain access to another person's account by obtaining the user's name and password, the person viewing communications on or from an account profile cannot be certain that the author is in fact the profile owner. *Id*. Thus, the fact that an electronic communication on its face purports to originate from a certain person's social networking account is generally insufficient standing alone to authenticate that person as the author of the communication. *See*

7

*Tienda*, 358 S.W.3d at 642. However, the most appropriate method for authenticating electronic evidence, as with any kind of evidence, "will often depend on the nature of the evidence and the circumstance of the particular case." *Id*. at 641.

The Texas Court of Criminal Appeals recently addressed the authentication of printouts of social-networking websites in *Tienda,* 358 S.W.3d at 638-47. In that case, the State offered evidence associated with three MySpace personal profiles, including account information and printouts of profile pages on which photographs, comments, and music were posted. *Id*. at 642. At trial, the defendant did not admit that he had authored the pages. *Id*. at 647. Further, the State did not attempt to authenticate the pages through the results of an examination of the defendant's internet history or hard drive, nor did the State attempt to link the pages to the defendant through an employee of the social-networking website. *Id*. Upon the State's offering, defense counsel objected to the admission of the evidence, emphasizing that the case-specific facts referenced in the MySpace messages associated with the account "were not facts solely within the defendant's knowledge, but were known to the deceased's family, friends, and practically any third party interested in the case." *Id*. at 636. Nevertheless, the trial court admitted the evidence over defendant's objection. *Id*. at 635.

On appeal, the court of criminal appeals held that there was "ample circumstantial evidence—taken as a whole with all the individual particular details considered in combination—to support a finding that the MySpace pages belonged to the appellant and that he created and maintained them." *Id*. at 645. For example, the court of criminal appeals noted that there were numerous photographs of defendant with his unique arm, body, and neck tattoos, as well as his distinctive eyeglasses and earring. There was also a reference to the victim's death and music from

8

his funeral, as well as references to the defendant's gang and messages referring to the shooting. *Id*.

While the court acknowledged that it was "conceivable" that someone else had fabricated and

maintained the MySpace pages, the court explained that this was a "scenario whose likelihood and

weight the jury was entitled to assess." *Id*. at 646.

In this case, the State introduced one exhibit comprised of printouts of three Facebook

messages alleged to have been sent by Campbell to Ana's Facebook account. Each message contain

a banner and date stamp at the top of the message stating, "Travis Campbell, March 2 [time]." The

first message states:

> what was i thinking I am totally wrong it don't matter what you say or do to me i
> should never put my hand on you, who is me to do that to you you give me nothing
> but love on your kids, then now i disregard that i am so sorry you or [sic] the only
> person i got on my side please help me ana please i would love to call u don't lock
> me up please i am begging you

Similarly, a second message, dated that same day, states:

> i did you bad something that you would never thaugh [sic] i am very sorry i am mad
> of my self, I am begging your fotgivness [sic] please i can't sleep or eat i f— up the
> bess [sic] thing i ever have, i am sorry ana help me please i am week [sic] i don't
> know what to do i am going to call u please answer please don't sign the paper please
> ana, I need to talk to u.

Finally, a final message, also dated March 2, states:

> please help me ana i cry every day i am so f—ing stuppid [sic] for hurthig [sic] u i
> am guilty what was I thinking please message me tell me your mind let me talk
> please, I am so ashame [sic].

At trial, the State attempted to impeach Campbell with the Facebook messages. In response, Campbell acknowledged having a Facebook account but denied sending Ana any Facebook messages after the incident. Campbell claimed that both he and Ana, but no one else, had his Facebook account password. In order to authenticate the messages, the State recalled Ana to testify about the origin of the messages. Ana testified that she recognized the printouts as messages she had received from Campbell on March 2, 2011. She also testified that she did not send them to herself. While Ana admitted that she had access to Campbell's Facebook account at sometime before March 2, she stated that both she and Campbell had changed their passwords before this date. Upon Ana's testimony, and over Campbell's objection as to authenticity, the trial court admitted the messages as a single exhibit.

In analyzing whether the evidence is sufficient to support the trial court's ruling, we start by noting that the content of the messages themselves purport to be messages sent from a Facebook account bearing Campbell's name to an account bearing Ana's name. While this fact alone is insufficient to authenticate Campbell as the author, when combined with other circumstantial evidence, the record may support a finding by a rational jury that the messages were authored and sent by Campbell. *See id*. at 642; *see also Commonwealth v. Purdy*, 945 N.E.2d 372, 381 (Mass. 2011) (explaining that e-mail sent from Facebook account bearing defendant's name not sufficiently authenticated without additional "confirming circumstances"). Accordingly, we examine whether the remaining evidence supports the trial court's ruling.

Turning to the Facebook messages themselves, we find that the messages contain internal characteristics that tend to connect Campbell as the author. First, the unique speech pattern

10

presented in the messages is consistent with the speech pattern that Campbell, a native of Jamaica, used in testifying at trial.[3] Second, the messages reference the incident and potential charges, which at the time the messages were sent, few people would have known about. *See Massimo v. State*, 144 S.W.3d 210, 216 (Tex. App.—Fort Worth 2004, no pet.) (concluding that "internal characteristics" served to authenticate e-mails, including fact that e-mail was sent shortly after altercation and referenced altercation and fact that contents of e-mails were written in same way in which appellant communicated). Thus, the contents of the messages provide circumstantial evidence supporting the trial court's ruling.

Further, the undisputed testimony provides circumstantial evidence tending to connect Campbell to the messages. The undisputed testimony yields the following: (1) Campbell had a Facebook account; (2) only he and Ana ever had access to his Facebook account; and (3) Ana received the messages bearing Campbell's name. This evidence suggests that only Campbell or Ana could have authored the messages received in Ana's Facebook account. In addition, Ana told the jury that she could not access Campbell's account, and therefore, she did not send the messages to herself. While this evidence certainly does not conclusively establish that Campbell authored the messages—in fact, Campbell insisted that he did not—the State was not required to "'rule out all possibilities inconsistent with authenticity or prove beyond any doubt that the evidence is what it purports to be.'" *See Manuel*, 357 S.W.3d at 74 (quoting *Chin*, 371 F.3d at 37). So long as the authenticity of the proffered evidence was at least "within the zone of reasonable disagreement,"

---

[3] For example, Campbell testified at trial, "I took the knife, but I never pointed to [Ana]. I take up the knife out of her way, her reach, and tell her that, this, you cannot play with knife because knife will give you a cut. That's why I take it. That's the thing that I told the detective."

the jury was entitled to weigh the credibility of these witnesses and decide who was telling the truth. *See Tienda*, 358 S.W.3d at 638, 645-46 (explaining that conceivably someone could have concocted appellant's MySpace page "[b]ut that is an alternate scenario whose likelihood and weight the jury was entitled to assess once the State had produced a prima facie showing that it was appellant, and not some unidentified conspirators or fraud artists, who created and maintained these MySpace pages").

The facts and issues in this case are similar to those in a case decided by our sister court of appeals in Fort Worth. *See Massimo*, 144 S.W.3d at 216-17. In that case, the defendant disputed the authenticity of a harassing e-mail that the State alleged she had sent to the complainant. *See id*. at 216-17. At trial, the defendant asserted that someone was impersonating her and sent the e-mail on her behalf. *Id.* However, the court of appeals concluded that the trial did not abuse its discretion in admitting the e-mail, explaining that the e-mail contained characteristic evidence supporting the assertion that appellant had sent it. *Id*. at 216. For example, the court pointed out that (1) the e-mail was sent shortly after a physical altercation between the defendant and complainant, and the e-mail referenced the altercation; (2) the complainant recognized the e-mail account as the defendant's and had previously received messages from the account; (3) only a few people knew about the things discussed in the e-mail; (4) the complainant testified that the way in which the e-mail was written was the way in which the defendant would communicate; and (5) another witness testified that she had seen the defendant send similar harassing e-mails from a different account. *Id*. While this case involves Facebook messages, as opposed to e-mails, the messages in this case likewise include similar identifying features.

From the record before us—including (1) the similarities between the speech pattern presented in the messages and Campbell's speech pattern at trial; (2) the fact that the messages

reference the incident and were sent just a few days after the incident; (3) testimony establishing that only Campbell and Ana have ever had access to Campbell's Facebook account; and (4) Ana's testimony that she did not have access to Campbell's Facebook account at the time the messages were sent—we conclude that there was prima facie evidence such that a reasonable jury could have found that the Facebook messages were created by Campbell. Accordingly, we cannot conclude that the trial court abused its discretion in admitting the evidence over Campbell's objection to authentication.

In addition, even if the trial court had abused its discretion in admitting the Facebook messages as evidence, we would find that the error was harmless. Campbell argues that the admission of the messages was harmful because Campbell and Ana had very different uncorroborated stories concerning the events leading to Ana's injuries, and the Facebook messages contain an admission that Campbell "put [his] hands on" Ana. Campbell contends that this alleged admission was "crucial" to the jury's finding that Campbell had committed aggravated assault.

The State contends that any error in admitting the Facebook messages was harmless because the State's case against Campbell, even aside from the messages, was substantial. The State argues that while Campbell and Ana's stories differ drastically, the State presented extensive evidence corroborating Ana's account. First, Ana's neighbor and cousin testified that Ana appeared to be in a state of shock shortly after the incident. Next, Gibbs, the sexual abuse nurse examiner, testified that Ana had extensive physical injuries, including multiple bruises, a perforated ear drum, trauma to the back of the throat, vaginal redness, and marks consistent with a two-prong fork. Gibbs also testified that Ana's injuries were consistent with her claim that she had been assaulted. Finally,

13

detectives investigating Ana's home found a window with the screen removed, a broken cell phone, a meat fork, and knives, just as Ana had described them.

Because error in the admission of evidence is non-constitutional, Campbell must show that the error affected his substantial rights. Tex. R. App. P. 44.2(b). A substantial right is affected when the error has a substantial and injurious effect or influence in determining the jury's verdict. *Rich v. State*, 160 S.W.3d 575, 577 (Tex. Crim. App. 2005). Substantial rights are not affected by the erroneous admission of evidence if, after examining the record as a whole, we have fair assurance that the error did not influence the jury, or had but slight effect. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). In making this determination, we consider whether the State emphasized the error, whether the erroneously admitted evidence was cumulative, and whether it was elicited from an expert. *Id*. at 356.

In this case, the testimony concerning the Facebook messages was not elicited from an expert. In addition, aside from impeaching Campbell with the messages at trial, the State did not otherwise emphasize the messages, including during its closing argument. Finally, upon review of the record, we conclude that the messages were cumulative of other evidence. At trial, Campbell testified as follows:

| STATE: | How did she hit you in your face? With her first or her open hand? |
|---|---|
| CAMPBELL: | Yes, she open hand she keep going like that. And I said, stop, Ana, stop. It was like a joke until it get serious. |
| STATE: | Did it hurt? |
| CAMPBELL: | Yes, it hurt, of course. But, you know, I'm a man, I don't really was, you know, going to hit her back, you know. |

|  |  |
|---|---|
|  | And then she start to slap me. She start to slap me. And I said, Ana, stop. If you don't stop I'm going to hit you back and you ain't going to like it because my one going to be harder than your own. That's what I told her, you know. |
| STATE: | Did she eventually stop hitting you? |
| CAMPBELL: | She never stop hitting me. She just take it as like a joke thing, but she were hitting me hard. |
| STATE: | After you told her to stop, then what happened? |
| CAMPBELL: | Then I hit her back. |
| STATE: | How did you hit her? |
| CAMPBELL: | I hit her with my hand. |
| STATE: | Where did you hit her? |
| CAMPBELL: | In her face right here. |

Thus, Campbell's own testimony was that he struck Ana. This testimony is entirely consistent with the statement in the Facebook message that Campbell claims was so crucial to the jury's verdict—"it don't matter what you say or do to me i should never put my hand on you."

In light of the cumulative evidence in the record demonstrating that Campbell struck Ana, we conclude that any error in admitting the evidence did not have a substantial and injurious effect on the jury's verdict and should be disregarded. Campbell's sole point of error is overruled.

## CONCLUSION

Because the trial court did not abuse its discretion in admitting the Facebook messages, we affirm the trial court's judgment.

_____

Diane M. Henson, Justice

Before Justices Puryear, Henson and Goodwin

Affirmed

Filed   August 31, 2012

Publish