# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-24-00136-CR

**Raymond V. Velasquez, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 264TH DISTRICT COURT OF BELL COUNTY
### NO. 22DCR86408, THE HONORABLE PAUL L. LEPAK, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Raymond Velasquez guilty of the third-degree felony offense of online impersonation. *See* Tex. Penal Code § 33.07(a)(2). He pleaded true to an enhancement paragraph alleging a prior felony conviction, and the jury found the allegation to be true and assessed his punishment at twenty years' confinement and a $1,000 fine. *See id.* § 12.42(a). The trial court sentenced him in accordance with the jury's verdict. In four issues on appeal, Velasquez challenges the sufficiency of the evidence supporting the jury's guilty verdict and the admission of text messages received by the victim's sister. We affirm the trial court's judgment of conviction.

## BACKGROUND

The indictment alleged that on or about November 30, 2021, Velasquez posted messages on the dating site Plenty of Fish (POF) using the name of his ex-girlfriend,

Priscilla DeLeon. The principal issue at trial was the identity of the messages' sender. To prove identity, the State introduced evidence of extraneous offenses purportedly committed by Velasquez from late September through the first week of December 2021. At hearings on the extraneous-offense evidence's admissibility, the State characterized his actions as "a continuing course of conduct over a series of months directed at" DeLeon that included sending messages "that make kind of a variety of threats . . . as well as posting intimate photos and videos."

The State's witnesses at trial included Jimmy Ansay, with whom Velasquez allegedly communicated through POF; members of the Temple Police Department (TPD) involved in the investigation of the charged offense; Sarah Glenn, DeLeon's sister; Roland Velasquez (Roland), Velasquez's twin brother; Arlon Greiner, DeLeon's former landlord; and DeLeon. The State's evidence included a screenshot of the POF profile that messaged Ansay, text messages between him and the profile's user, subscriber-information records for a Yahoo email account, and text messages received by Glenn. Velasquez did not present evidence during his case-in-chief.

Ansay testified about his interaction with the POF profile, for which the username was "hermosa_princesa254." On November 30, a profile purporting to belong to DeLeon and including a profile picture of a woman contacted Ansay. Ansay and the profile's user messaged on the POF app and eventually exchanged phone numbers. Although Ansay texted the number that appeared on the hermosa_princesa254 profile, the profile's user responded through a different number, ending in -3983, which led Ansay to think "maybe that account is no good, that phone number is no good." Nevertheless, when the -3983 number sent him a photograph of a nude woman and invited him to a residence, he agreed.

2

When Ansay at 11:15 p.m. texted that he had arrived at the house, the -3983 number responded, "The doors been open I don't have a problem . . . . I have no bra lol," and sent him another photograph of the same woman baring her breast. Before he could knock or ring the doorbell, DeLeon—whom Ansay identified as the woman in the profile picture and photographs— met him at the door; she was "very disturbed" and was confused by his presence. She denied that she had texted him and said that she would "get an officer to come back and talk to [him] about the situation . . . that's going on."

Ansay showed the texts he had received to the officer, who arrived within twenty minutes. Ansay met with officers again in May 2022 and when shown the screenshot of the POF profile that was admitted at trial, confirmed that it was the one he had seen. On cross-examination, he testified that he had tried to show the profile to law enforcement, but it had seemingly been deactivated. He also testified that most of the accounts on POF were fake, that he did not recognize the -3983 number, and that he never knew to whom the number belonged.

Sergeant James Carr testified about his response to DeLeon's house on November 30 as well as his familiarity with problems in her and Velasquez's relationship. Sergeant Carr testified, "Every shift, we were getting multiple calls for that location in reference to her being harassed by her ex[,] . . . Raymond Velasquez," with whom Sergeant Carr had interacted. In October and November 2021, TPD was "dealing with harassment, vandalism, just general harassment calls" involving Velasquez and DeLeon; the alleged harassment occurred in person, by phone, and online. Consequently, Sergeant Carr approached the call on November 30 "as a lesser included offense to a more serious offense [he] was investigating," namely, stalking.

On December 1, he interviewed DeLeon at the police station for around two hours. She was "real scared and real cautious about coming down . . . . She was super scared like very,

very, very scared, and it was evident to [him] that she was scared." Following the interview, he passed the case to a detective.

Glenn, DeLeon's sister, testified after Sergeant Carr. Before she did, the trial court held a hearing outside the jury's presence regarding the admissibility of text messages she had received and which she believed had been sent by Velasquez. The State offered the messages, which were sent to her on December 8 and 9, respectively, as State's Exhibits 4 and 5. Defense counsel objected that the texts were irrelevant because Glenn received them a week after the charged offense and because they were being offered only to "paint [Velasquez] as a bad person, as a bad boyfriend, a bad ex-boyfriend, a bad husband, just overall a bad person, as opposed to any proof that he posted that profile on Plenty of Fish."[1] The trial court declined to rule on counsel's objections at the hearing and instructed counsel to make any objections during Glenn's testimony.

Glenn testified about a series of messages, including State's Exhibits 4 and 5, that she received from Velasquez after he and DeLeon broke up in September 2021. Although Glenn had never spoken with Velasquez, she knew him and identified him in court. She received the first message on September 30, 2021, from his Facebook account, which had his picture. She did not open the message because it mentioned "something about blurring something out," which made

---

[1] Specifically, defense counsel asserted at the hearing, "I would renew those objections based on lack of relevance." From the record, it appears that counsel was referring to a hearing outside the jury's presence at the beginning of trial, which concerned the State's motion in limine and at which the State previewed its intent to offer extraneous-offense evidence. During the hearing, counsel requested a limiting instruction contemporaneous with the admission of any extraneous-offense testimony as well as an instruction in the jury charge. The trial court responded to counsel's request, "So, if you're asking for a running objection to the evidence that will constitute paragraph T [of the motion in limine], I'll give you a running objection. Make one in front of the jury and ask for a limiting instruction, I'll give it." Defense counsel did not make an evidentiary objection at the hearing, nor did the court rule on any such objection.

her nervous, and because she saw that it contained "a whole bunch of curse words." She did not respond to him.

Over counsel's relevance objection and subject to the trial court's limiting instruction, Glenn testified that Velasquez sent her another message, on December 1, 2021, which is her birthday, in which he threatened to kill DeLeon. Without objection, Glenn then testified that between the messages on September 30 and December 1, Velasquez sent her several text messages including "[i]nappropriate pictures" of DeLeon, whose face was visible in the photographs. Glenn described the photographs as "sexual pictures that were taken in different positions." She told DeLeon about them.

Next, Glenn testified about the contents of State's Exhibits 4 and 5:

State's Exhibit 4

Ur sis about to put all y'all on the map and idgaf I kill all y'all let's get started and see how she want to keep my shit and see who lies and see how she gets know in temple show y'all she put all y'all in it and idgaf who ur man is and this how we play when she say boss move fuck a fiend tell her get Diane off my dick and she put all y'all out there things I know about all y'all she fuck y'all life up WACTH

State's Exhibit 5

Eought talk y'all better not hate me I give ur sis a hour will see I leave two kids behind cause I killed ur bitch ass sister mark my words ask ur older bro I will not let her robbed me n disrespect me on my two kids Alexis n peanut say nomore never scared in my body or life all I will ever say!!!!!!!!! Give one hour Also her kids better not hate me but what happens I'll make the news again I'm not that guy but I want to take no more disrespectful shit from her hate to put yall it but she put my family in it it is what it is they know more**1000000**

Glenn did not recognize the phone number, ending in -8605, that sent State's Exhibit 4. State's Exhibit 5 did not indicate from what number it was sent. Nevertheless, she recognized Velasquez as the sender of both messages from their content. Apparently confusing

5

the two messages, she testified that in Exhibit 4, he stated the names of his children and "also said things that only Raymond would know." In Exhibit 5, he likewise "said [things] about [her] sister and [her sister's] family." The trial court overruled defense counsel's authentication, hearsay, hearsay-within-hearsay, relevance, and confrontation objections to the admission of Exhibits 4 and 5. Regarding the latter, counsel had explained, "I can't effectively cross-examine or confront any accuser because nobody has been identified as being the true source in any of these messages."

Noting its previous limiting instructions, the trial court admitted State's Exhibits 4 and 5 with a limiting instruction:

> Any behaviors that are not specifically set out in the terms of the indictment are there—is admissible only for the limited purpose of helping you determine whether the allegations of the indictment are true and cannot be used for any other purpose or you can't find somebody guilty of the charged offense if there's a reasonable doubt as to that offense based on the fact that they did something else bad. So their limited use is only to help you decide if the defendant has committed the offense alleged in the indictment.

Defense counsel obtained running objections regarding the exhibits' admission.

Glenn further explained why she believed Velasquez had sent the texts. She understood "ur sis" in State's Exhibit 4 to refer to DeLeon and understood both texts to threaten her and DeLeon's lives. Glenn was unsure whether the reference to leaving "two kids behind" in State's Exhibit 5 referred to Velasquez's or DeLeon's children. Consistent with the statement in State's Exhibit 5, Velasquez has two children: Alexis and another child, nicknamed "Peanut." Glenn had never received a threatening message from anyone other than Velasquez, and only her family members had her phone number. When she received the texts, she did not have a problem with anyone other than Velasquez. She feared from the statement "I killed ur . . . sister" in State's Exhibit 5 that he had murdered DeLeon. Glenn installed cameras in her house because of the texts.

6

Roland, Velasquez's twin brother, testified that he had known DeLeon for around seventeen years, "way before Raymond came into the picture," and that he still communicated with her. He also testified about a conversation he had with Velasquez around the time of his breakup with DeLeon in September 2021. Velasquez mentioned that he was going to create a dating profile and pretend to be DeLeon. He admitted to "[d]oing bad things like posting nudes [of DeLeon] or something like that" because he believed she was cheating on him. Roland told Velasquez that he was upset and did not approve of Velasquez's actions, but Velasquez "really didn't care."

Roland noted that Velasquez has two children, Alexis and Raymond, who is nicknamed "Peanut." In 2021, Roland mostly spoke with Velasquez by phone. Velasquez had multiple phone numbers; "[t]here were about two at a time," and his number "changed often, . . . [s]ometimes within weeks." On occasion, he would communicate with Roland using multiple numbers on the same day.

On cross-examination, Roland testified that he had never created or followed a POF profile; that he knew who Glenn was but did not know how to contact her; and that he did not recognize the number ending in -3983, which had been used to text Ansay. Asked if he would be able to reach out to Glenn if needed, Roland testified, "No. I don't communicate with her like that at all." He testified that he never "took on the persona of [his] brother in order to send messages" and never "created profiles or did anything pretending" to be Velasquez. Roland, who is married, did not have a reason to "drive a wedge" between Velasquez and DeLeon, whom he described as a "great friend."

Greiner, who owned the rental property in which DeLeon lived at the time of the offense, testified about receiving "disturbing" messages from an unknown number—which he no

7

longer remembered—in December 2021. Someone identifying himself as "Raymond" began texting Greiner "bad things" about DeLeon as well as "things [that] were going on in [her] house" about which Greiner needed to know. "Raymond" also sent him "a couple of lewd videos" and texted that he had lived in the rental property for the last few months, was a truck driver, and had been paying the rent. When Greiner began receiving videos of DeLeon engaged in intercourse, he "freaked out" and deleted them. Although he initially testified that he and "Raymond" had only texted, after refreshing his recollection, Greiner testified that "Raymond" had called and told Greiner who he was and had said that DeLeon was his girlfriend. Greiner eventually visited the rental property, but only DeLeon was present. He noticed that the back door had been kicked open so that the door jamb "was all splintered."

On cross-examination, Greiner testified that DeLeon had begun renting from him in 2021, signed the lease as the responsible party, and always paid her rent by money order. He had never seen Velasquez.

Sergeant Tom Wolff testified that he had previously worked in the Criminal Investigation Division's forensic department and had performed an extraction on DeLeon's cell phone after receiving it on March 22, 2022. He gave his results and report to Detective Kenneth McRae. Sergeant Wolff testified that he did not perform extractions on any other phones in the case.

Detective McRae testified regarding the investigation of the fake POF account. Early in the investigation, he reviewed around twenty-five screenshots of messages, photographs, and videos that DeLeon had provided to law enforcement. He tracked the number ending in -3983, with which Ansay had texted, to a company called Bandwidth, which sells access to phone numbers it owns to other companies. Bandwidth directed Detective McRae to a company called

8

TextNow, which McRae served with a search warrant. He learned that the -3983 number was associated with a Yahoo email address, deleonpriscilla643@yahoo.com, and had made calls from November 30 to December 1, 2021. The number was active only during the two-day period. Detective McRae cross-referenced the phone numbers on the -3983 number's call log with DeLeon's phone contacts, which led him to speak to Greiner, Glenn, and one of DeLeon's home-healthcare patients. The call log showed that the number had called Ansay three times, but Detective McRae did not know if the calls—for sixty seconds, forty seconds, and three seconds, respectively—had been answered. In addition to the phone calls, during the two days it was active, the -3983 number sent 107 text messages.

Detective McRae next served Yahoo with a search warrant. Although the -3983 number was the phone number for the deleonpriscilla643@yahoo.com email address, the Yahoo account was also associated with a different phone number, which had been used as a recovery number and to verify the account for two-factor-authentication purposes. From 911 service calls, Detective McRae determined that the second phone number belonged to Velasquez's mother.

Based on this information, Detective McRae served a third search warrant, this time on POF. He learned that the hermosa_princesa254 POF account had been created on November 30, 2021, and that the creator had provided DeLeon's date of birth when setting up the profile. In the documents Detective McRae received from POF was the screenshot of the hermosa_princesa254 profile picture, which was a photograph of DeLeon. He showed the screenshot to Ansay, who confirmed that it was the profile with which he had communicated.

DeLeon testified about her relationship with Velasquez and about his campaign of harassment against her after their relationship ended. She had known about him through Roland for a long time before she began dating Velasquez in June 2021. They moved in together a month

9

later. Around two months after he moved in, they began to have problems. He was upset that she had to work overnight as a home-health worker and on one such night, in many calls and texts, accused her of cheating on him. He had caused her to move her phone number to his phone plan, and that night, he disconnected her phone six times.

In another incident, he "kept blowing up [her] phone" while visiting his mother, who lived in Temple. When he returned to DeLeon's house, he "was talking mess" and tried to spit on her. They eventually reconciled, but their relationship ended in October 2021 after he again accused her of cheating and began "talking crap" about her at his sister's house in Austin. Driving home that night, he cracked her car radio by striking it. Once at the house, he "slashed" her bed, headboard, and couches; poured motor oil on her clothes; kicked in her back door; and damaged items in her house. She asked him to leave the next morning.

According to DeLeon, "[t]hat's when all the harassing started, the stalking started, the phone calls, the different phone numbers, the name calling." Velasquez's mother "would get in the middle of it" and called her. He was a truck driver and became upset when—around two days after she kicked him out and after he left town for work—DeLeon called his mother and asked her to pick up his belongings. DeLeon did not know why he was angry that she wanted his belongings out of her house, but he "was pissed and called his mom, and he was talking crap to his mom."

After they broke up, Velasquez texted DeLeon "[a] whole lot" from "[m]any numbers." He sent her around twenty-to-thirty texts per day, including both short, one-line messages and "big block paragraphs." In his texts, he accused her of cheating, called her names, expressed his hatred of her, and talked about her children. He threatened her, her children's, and Glenn's lives. She reported the texts to police on numerous occasions.

10

Later, Velasquez began creating fake social media accounts in her name and posting to them intimate photographs and videos that she had sent him during their relationship or that he had recorded on his phone. She had taken one of the photographs sent to Ansay and shared it with only Velasquez; either she or Velasquez had taken the other, and only he had possessed it. She did not send nude photographs of herself to anyone else or allow intimate videos or photographs to be taken of her; as far she knew, he was the only person who had such recordings of her.

She saw the images posted to Facebook and Instagram accounts pretending to be her. She guessed that one such Instagram account—which had her name and photograph, her daughter's name and phone number, and Velasquez's name—was supposed to be hers, but she did not have an Instagram account. She saw accounts like that "a few times"; at other times, Roland would send her photographs he had received from Velasquez. When her daughter was fourteen years old, she showed DeLeon a photograph depicting DeLeon's breast that she had been sent.

DeLeon never created a POF account or gave anyone permission to do so on her behalf. She identified herself in the profile picture for the hermosa_princesa254 profile. When a man showed up at her house late on November 30, she was intimidated and thought Ansay was Velasquez. Velasquez's harassment continued until December 27, 2021, when she changed her and her children's phone numbers.

After hearing the evidence and the attorneys' arguments, the jury found Velasquez guilty of online impersonation. This appeal followed.

11

## DISCUSSION

### I.  Sufficiency of the Evidence

In his first issue, Velasquez contends that "[t]he evidence is insufficient to support [his] conviction because the State failed to prove [he] was the person who committed the charged offense against DeLeon." Specifically, he argues that the State failed to connect him to the phone number used to text Ansay or to authenticate the texts sent to DeLeon and Glenn. The jury could have found the element of identity proven beyond a reasonable doubt, Velasquez asserts, only by "indulging in mere speculation." The State responds that Velasquez had motive to harm DeLeon, that the evidence demonstrated that he intended to intimidate her, and that the jury could have reasonably inferred from the evidence that he created the POF profile that contacted Ansay.

Due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 313 (1979); *Lang v. State*, 561 S.W.3d 174, 179 (Tex. Crim. App. 2018). When reviewing the sufficiency of the evidence to support a conviction, we consider all of the evidence in the light most favorable to the verdict to determine whether, based on that evidence and reasonable inferences therefrom, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). We measure the sufficiency of the evidence against the hypothetically correct jury charge. *Garcia v. State*, 667 S.W.3d 756, 762 (Tex. Crim. App. 2023).

In conducting our review, we evaluate all the evidence in the record, whether direct or circumstantial, properly or improperly admitted, or submitted by the prosecution or the defense. *Thompson v. State*, 408 S.W.3d 614, 627 (Tex. App.—Austin 2013, no pet.); *see Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). We presume that the trier of fact resolved conflicts

12

in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Jackson*, 443 U.S. at 318; *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). Our concern is whether the factfinder reached a rational decision. *Arroyo v. State*, 559 S.W.3d 484, 487 (Tex. Crim. App. 2018); *see Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016) (observing that reviewing court's role on appeal "'is restricted to guarding against the rare occurrence when a fact finder does not act rationally'" (quoting *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010))).

The trier of fact is the sole judge of the weight and credibility of the evidence. *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018); *see* Tex. Code Crim. Proc. art. 36.13 (explaining that "the jury is the exclusive judge of the facts"). Thus, when performing an evidentiary-sufficiency review, we may not reevaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Arroyo*, 559 S.W.3d at 487. When the record supports conflicting reasonable inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that resolution. *Zuniga*, 551 S.W.3d at 733; *see Musacchio v. United States*, 577 U.S. 237, 243 (2016) (reaffirming that appellate sufficiency review "does not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts'" (quoting *Jackson*, 443 U.S. at 319)).

Inference means "a conclusion reached by considering other facts and deducing a logical consequence from them." *Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007). "Speculation," on the other hand, refers to "mere theorizing or guessing about the possible meaning of facts and evidence presented." *Id.* "A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt." *Id.* We must "'determine whether the necessary inferences are

13

reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.'" *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015) (quoting *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). The factfinder may rely on common sense and apply observation and experience gained in ordinary affairs when drawing inferences from the evidence. *Garcia*, 667 S.W.3d at 762.

As charged in this case, the offense of online impersonation includes the following elements: (1) a person uses the name or persona of another person to post or send one or more messages through a commercial social networking site or other Internet website (2) without the other person's consent and (3) with the intent to harm, defraud, intimidate, or threaten any person. *See* Tex. Penal Code § 33.07(a)(2); *cf. Dupuy v. State*, 631 S.W.3d 233, 238 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd) (listing elements for indictment under subsection 33.07(a)(1)). "Commercial social networking site" means

> any business, organization, or other similar entity operating a website that permits persons to become registered users for the purpose of establishing personal relationships with other users through direct or real-time communication with other users or the creation of web pages or profiles available to the public or to other users. The term does not include an electronic mail program or a message board program.

Tex. Penal Code § 33.07(f)(1).

Velasquez's complaint is limited to the element of identity. In arguing that the State failed to meet its burden of proof, he asserts that there was a lack of evidence directly linking him to the POF profile and that the State failed to authenticate or connect the text messages sent to DeLeon and Glenn to him. Despite the lack of a forensic "smoking gun," there was ample circumstantial evidence from which a rational jury could have inferred that Velasquez was responsible for creating the POF profile using DeLeon's name and persona. The State may prove

14

a defendant's identity and criminal culpability by either direct or circumstantial evidence, *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009), which is "as probative as direct evidence in establishing the guilt of an actor" and "alone can be sufficient to establish guilt," *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014). It is unnecessary that "every fact and circumstance point directly and independently to the defendant's guilt" so long as "the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances." *Id.*

As an initial matter, we note that to the extent that Velasquez—by challenging the authenticity of the text messages sent to DeLeon and Glenn as well as the texts' connection to him—argues that we should not consider the messages in our sufficiency analysis or should conclude that jurors gave them little weight, his argument is misplaced. In conducting our analysis, we consider all evidence, including the texts, regardless of whether it was properly or improperly admitted. *See Thompson*, 408 S.W.3d at 627; *see also Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004) ("[A]n appellate court must consider *all* evidence actually admitted at trial in its sufficiency review and give it whatever weight and probative value it could rationally convey to a jury."). Moreover, we presume that the jury weighed the evidence in a manner supporting its guilty verdict. *See Jackson*, 443 U.S. at 318; *Laster*, 275 S.W.3d at 517.

Roland, Velasquez's twin brother, testified that Velasquez had told him that he was going to create a dating profile in DeLeon's name and had admitted to "[d]oing bad things like posting nudes [of DeLeon] or something like that" because he believed DeLeon was cheating on him. DeLeon likewise testified that prior to the creation of the POF profile, Velasquez had created fake social media profiles of her and had posted to them intimate photographs and videos that she sent him during their relationship or that he recorded on his phone. She saw accounts pretending to be her "a few times."

15

Several features of the hermosa_princesa254 profile suggested that Velasquez was the profile's creator. DeLeon testified that only Velasquez and she had access to the nude photographs sent to Ansay. The profile was created in late November 2021, a month or two after she told Velasquez to leave her house and after their relationship acrimoniously ended. The profile's user knew her address, at which Velasquez had lived for several months, as well as her birthday. And the user contacted Ansay using two phone numbers, which the evidence showed Velasquez was known to do. Roland testified that Velasquez sometimes used two numbers simultaneously and changed numbers often. DeLeon similarly testified that Velasquez texted her from "[m]any numbers."

Moreover, a rational juror could have reasonably inferred that Velasquez had controlled the -3983 phone number through which the profile's user texted Ansay. Velasquez's mother's phone number was the recovery and two-factor authentication number for the Yahoo email address associated with the -3983 number. DeLeon testified he had "talk[ed] crap" about her to his mother, who "would get in the middle of" their conflict. In the profile's two days of existence, the -3983 number sent 107 texts. Such a volume was consistent with DeLeon's testimony that Velasquez texted her "[a] whole lot," around twenty-to-thirty times per day, and "kept blowing up [her] phone." Moreover, the -3983 number's user was seemingly familiar with DeLeon's phone contacts. A cross-reference of her contacts and the -3983 number's call logs revealed that the number had called her sister, former landlord, and home-healthcare patient. The latter is notable because DeLeon testified that on one occasion, Velasquez became angry that she had to stay overnight at a patient's house, which he believed was a pretense for her to be unfaithful.

The evidence indicated that the fake POF profile was created as part of a larger pattern of harassment and vandalism, which Sergeant Carr characterized as "stalking," perpetrated

16

by Velasquez against DeLeon and her family and acquaintances. Like the texts sent to Ansay, the messages that Glenn testified she received from Velasquez contained numerous spelling and grammatical errors and included "[i]nappropriate pictures" of DeLeon. The first messages came from Velasquez's Facebook account and, also like the texts sent to Ansay, contained "a whole bunch of curse words."

Greiner, DeLeon's former landlord, received texts from someone purporting to have Velasquez's first name and profession and claiming to be DeLeon's boyfriend. The texts' sender, whom the jury could have reasonably inferred was Velasquez himself, sent Greiner "lewd videos" of DeLeon having intercourse. Greiner's testimony additionally corroborated DeLeon's account that on the night before she broke up with Velasquez, he kicked in her back door and damaged and destroyed items in her house; Greiner testified that he observed that the door jamb "was all splintered." The harassment against DeLeon ended only when she changed her and her children's phone numbers, from which a rational juror could have concluded that the offender was someone no longer in her life.

From this evidence, when viewed in the light most favorable to the jury's verdict, a rational juror could have found beyond a reasonable doubt that Velasquez created the hermosa_princesa254 profile on POF in DeLeon's name, and thus the evidence was sufficient to prove online impersonation. *See Jackson*, 443 U.S. at 319; *Temple*, 390 S.W.3d at 360; *see also Dupuy*, 631 S.W.3d at 239 ("[B]ecause this is a sufficiency challenge, we must view the evidence in the light most favorable to the verdict, which means that even if there were evidence in support of appellant's defensive theory that he was framed, we could not indulge it.").

17

## II.     Admission of Text Messages Received by Glenn

Velasquez's second, third, and fourth issues expressly allege, or are predicated on, the State's failure to prove sufficiently that he sent the text messages received by Glenn on December 7 and 8, 2021.  In his second and third issues, respectively, he contends that the trial court abused its discretion by admitting the text messages because they were irrelevant and were not authenticated.  He argues that the texts' relevance in turn "depends on whether [they were] properly authenticated."  Both issues center on his assertion that the State offered no evidence "to authenticate/identify [the texts'] author—none at all."  His fourth issue, a confrontation claim, is likewise grounded in the texts' authenticity; he contends that their admission "violated his right of confrontation because the text messages had not been adequately authenticated to show that they were his own, and he was not able to cross-examine the actual author of the messages."  The State responds that the texts were relevant to prove his intent to intimidate DeLeon; that the trial court could have reasonably concluded from the evidence that he authored the texts; and that their admission did not violate the Confrontation Clause because they were his own statements and were non-testimonial.  The State argues in the alternative that any error resulting from the admission of the texts was not harmful.  Because our resolution of the second and fourth issues depends on our determination of the texts' authenticity, we address Velasquez's third issue first.

"As with other types of evidence, text messages may be authenticated by 'evidence sufficient to support a finding that the matter is what its proponent claims.'"  *Butler v. State*, 459 S.W.3d 595, 600–01 (Tex. Crim. App. 2015) (quoting Tex. R. Evid. 901(a)).  Rule 901(b) sets out "a non-exhaustive list of examples of the types of extrinsic evidence" that satisfy this requirement.  *Lozano v. State*, 706 S.W.3d 429, 456 (Tex. App.—Austin 2024, no pet.); *see* Tex. R. Evid. 901(b).  It is ultimately the jury's responsibility as the trier of fact to determine whether

18

an item of evidence is what its proponent claims. *Butler*, 459 S.W.3d at 600. In making a "preliminary" or "threshold" determination regarding the evidence's admissibility, the trial court "need not be persuaded that the proffered evidence is authentic" but must decide "simply whether the proponent of the evidence has supplied facts that are sufficient to support a reasonable jury determination that the evidence he has proffered is authentic." *Id.*; *see Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). This threshold is not "'a particularly high hurdle,'" *Campbell v. State*, 382 S.W.3d 545, 549 (Tex. App.—Austin 2012, no pet.) (quoting Peter T. Hoffman, *Texas Rules of Evidence Handbook*, Article IX at 948 (8th ed. 2008–09)), and "has been aptly described as a 'liberal standard of admissibility,'" *Butler*, 459 S.W.3d at 600 (quoting Hon. Cathy Cochran, *Texas Rules of Evidence Handbook* 922 (7th ed. 2007–08)). "Conclusive proof of authenticity before allowing admission of disputed evidence is not required." *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim. App. 2018). The evidence's proponent need not rule out all possibilities inconsistent with authenticity nor prove beyond all doubt that the evidence is what it is claimed to be. *Campbell*, 382 S.W.3d at 549. "As with evidence in general, authenticating evidence may be direct or circumstantial." *Butler*, 459 S.W.3d at 602.

Moreover, in determining the evidence's admissibility, the trial court is not ordinarily required to "make a threshold determination of the *credibility* of the evidence proffered by the proponent to establish authenticity" or to find that a sponsoring witness is believable. *Id.* at 605 (emphasis added). "Even when a trial court judge *personally* harbors some doubt as to the general credibility of a sponsoring witness, a decision to admit particular evidence sponsored by that witness may not necessarily be outside the zone of reasonable disagreement," so long as jurors "could rationally choose to believe the sponsoring witness," whose testimony would establish that the proffered evidence is what it purports to be. *Id.*

19

We review a trial court's ruling on a preliminary authentication issue for abuse of discretion, a deferential standard requiring that we uphold the ruling if it is within the zone of reasonable disagreement. *Fowler*, 544 S.W.3d at 848. An abuse of discretion does not occur unless the trial court acts "arbitrarily or unreasonably" or "without reference to any guiding rules and principles." *State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016) (quoting *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). "A trial court judge is given considerable latitude with regard to evidentiary rulings," and "[d]ifferent trial judges may 'reach different conclusions in different trials on substantially similar facts without abusing their discretion.'" *Fowler*, 544 S.W.3d at 848 (quoting *Winegarner v. State*, 235 S.W.3d 787, 791 (Tex. Crim. App. 2007)). We must review the trial court's ruling in light of the evidence before the court at the time its ruling was made. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

When it comes to electronic communications, "the authentication issue that generally arises is whether the evidence is sufficiently linked to the purported author." *Campbell*, 382 S.W.3d at 549. The Rules of Evidence are generally considered adequate, but we recognize that "electronic communications are susceptible to fabrication and manipulation." *Id.* at 549–50. Among the many ways that such evidence may be authenticated are by: (1) direct testimony from a witness with personal knowledge; (2) comparison with other authenticated evidence; (3) circumstantial evidence peculiar to the facts of the case; (4) inclusion of information that only the purported sender could be expected to know; or (5) distinctive characteristics found within the evidence itself—including its appearance, contents, substance, and internal patterns—considered in conjunction with other circumstances. *See Butler*, 459 S.W.3d at 601–03; *Tienda*, 358 S.W.3d at 638, 640–41; *see also* Tex. R. Evid. 901(b) (listing as examples "testimony of a witness with knowledge" and "distinctive characteristics and the like"). "[T]he best or most appropriate method

20

for authenticating electronic evidence will often depend upon the nature of the evidence and the circumstances of the particular case." *Tienda*, 358 S.W.3d at 639.

In the present case, the text messages' distinctive characteristics, when viewed together with other circumstantial evidence in the record, support the conclusion that Velasquez was the texts' author. Glenn received the texts around a month or two after Velasquez and DeLeon's bitter breakup. *See Massimo v. State*, 144 S.W.3d 210, 216 (Tex. App.—Forth Worth 2004, no pet.) (considering, in electronic-communications harassment case, that offending email was sent shortly after altercation between defendant and victim). Sergeant Carr testified that in the months after the breakup, Velasquez had engaged in an extensive campaign of vandalism and harassment—including by phone—against Deleon and that officers were being called to her house "[e]very shift . . . in reference to her being harassed by her ex." Velasquez's resentment against her gave him motive to threaten both her and her family, including Glenn; there is no evidence of another person with such a motive. *See Butler*, 459 S.W.3d at 604 (noting in authenticity analysis that "Appellant had a motive" to send text message and that "[t]he record fail[ed] to suggest anybody else who might have had a similar motive"). Glenn testified that he had sent her other threatening messages, including from his personal Facebook account, in the months before she received the texts.

The text messages' content also tied them to Velasquez. The messages were replete with swearing; expressed loathing toward Glenn's sister; and contained threats to "kill all y'all," "put all y'all on the map," "leave two kids behind," "kill[] ur . . . sister," and "make the news again." Glenn testified that the first message she received from Velasquez's Facebook account similarly contained "a whole bunch of curse words" and made her nervous because it mentioned "blurring something out." She also testified that the December 7 and 8 texts "said [things] about

21

[DeLeon] and [DeLeon's] family" and that they "also said things that only Raymond would know." Indeed, she testified that he explicitly named his children in one of the texts, in apparent reference to the statement "on my two kids Alexis n peanut." Although he argued at trial and maintains in his brief on appeal that someone could have been impersonating or framing him, such a theory, for which no supporting evidence was presented at trial, would not necessarily render the texts inadmissible. As the Court of Criminal Appeals has explained:

> "When all that the objecting party offers is speculation or conjecture about who, other than the putative creator, 'could' have created the evidence, such questions are properly left to the jury in determining how much weight, if any, to give to the evidence—provided that the trial judge is convinced that the proponent has met the relatively low threshold required by Rule 901(a) of producing facts that would be sufficient for a reasonable jury to conclude that the evidence was created by the putative creator."

*See id.* at 604 n.12 (quoting Hon. Paul W. Grimm, Lisa Yurwit Bergstrom & Melissa M. O'Toole–Loureiro, *SYMPOSIUM: Keynote Address: Authentication of Social Media Evidence*, 36 Am. J. Trial Advoc. 433, 458 (Spring 2013)). Elsewhere, the court has recognized that the possibility that a defendant may be "the victim of some elaborate and ongoing conspiracy" is "an alternate scenario whose likelihood and weight the jury [i]s entitled to assess once the State had produced a prima facie showing" that the defendant authored the evidence in question. *Tienda*, 358 S.W.3d at 645–46.

Additionally, the December 7 and 8 text messages sent to Glenn, other messages sent to her between September 30 and December 1, and the texts sent to Ansay share distinct features. Glenn testified that, as in the December 7 and 8 texts, a message she received from Velasquez on December 1 included a threat to kill her sister. She further testified that he sent her several messages containing "[i]nappropriate pictures" of DeLeon. Similarly, the -3983 number,

one of two with which Ansay communicated, texted him nude photographs of DeLeon, and the texts to Ansay exhibited the same broken syntax, spelling, and grammar errors seen in the December 7 and 8 texts to Glenn.[2] These shared features support an inference that Velasquez, as part of his harassment of DeLeon, was using multiple phone numbers to send texts threatening her and divulging intimate images of her. The December 7 and 8 texts fit comfortably within this inference and add support for his authorship.

The trial court need not have personally believed or found credible Ansay's, Sergeant Carr's, and Glenn's testimony; it was enough that a rational juror could have chosen to believe them. *See Butler*, 459 S.W.3d at 605. In light of both the low, liberal threshold for admissibility under Rule 901 and our own highly deferential standard of review, we conclude that the trial court did not abuse its discretion by determining that the State presented sufficient evidence to allow a reasonable juror to find that Velasquez composed the texts messages sent to Glenn on December 7 and 8, 2021. *See Fowler*, 544 S.W.3d at 848; *Butler*, 459 S.W.3d at 600; *Campbell*, 382 S.W.3d at 549; *see also* Tex. R. Evid. 901. We therefore overrule his third issue. And because Velasquez's second and fourth issues are predicated on the premise that he did not author the text messages, we overrule those issues as well. *See* Tex. R. App. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal."), .4 ("If the issues are settled, the court should write a brief memorandum opinion no longer than necessary to advise the parties of the court's decision and the basic reasons for it.").

---

[2] Included in the texts sent to Ansay were: "Where you from," "Ok knock on door I taking my dog fast shower," and "Just me alone and watching tv." The -3983 number also gave DeLeon's street name as "alvaon rd."

## CONCLUSION

Having overruled Velasquez's issues, we affirm the trial court's judgment of conviction.

_____
Maggie Ellis, Justice

Before Justices Theofanis, Crump, and Ellis

Affirmed

Filed:   February 13, 2026

Do Not Publish